BAILEY'S, INC., Plaintiff–Appellant,

v.

WINDSOR AMERICA, INC.; and
Windsor Machine Company, Ltd.,
Defendants–Appellees.

No. 88–5919.

United States Court of Appeals,
Sixth Circuit.

Argued May 26, 1991.

Decided Nov. 6, 1991.

Rehearing and Rehearing En Banc
Denied Dec. 19, 1991.

John McQuiston, II (briefed), Goodman, Glazer, Greener, Schneider & McQuiston, William L. Gibbons (argued and briefed),

Evans & Petree, Memphis, Tenn., for plaintiff-appellant.

James D. Senter, III, Senter & Senter, Humboldt, Tenn., Andrew S. Krulwich (argued), Walter J. Andrews, Paul F. Khoury (briefed), Wiley, Rein & Fielding, Washington, D.C., for defendants-appellees.

Before NELSON and BOGGS, Circuit Judges, and ALDRICH, District Judge.*

DAVID A. NELSON, Circuit Judge.

This is a treble-damage action brought under the antitrust laws by Bailey's, Inc., a California corporation that operates a mail order logging supply business.

One of plaintiff Bailey's suppliers was defendant Windsor America, Inc., which sells chain saw replacement products (primarily guide bars and saw chain) manufactured by Windsor America's Canadian parent, defendant Windsor Machine Company, Ltd. A predecessor of Windsor America began selling Windsor products to Bailey in 1978, and this sales relationship continued until Windsor America terminated it in 1983–84.

Following the termination, Bailey sued Windsor America and Windsor Machine (collectively, "Windsor") in federal court. The complaint alleged, among other things, that the termination resulted from a combination or conspiracy in restraint of trade, with Windsor joining in what Bailey now calls a "horizontal boycott" among competing distributors of Windsor products. The distributors themselves were not joined as defendants.

After extensive discovery proceedings had been conducted, the district court entered summary judgment in favor of defendant Windsor. Applying the test set forth in *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984), the court held that Bailey had failed to present evidence that would "tend[ ] to exclude the possibili-

---

* The Honorable Ann Aldrich, United States District Judge for the Northern District of Ohio, sitting by designation.

ty that the manufacturer and nonterminated distributors were acting independently."

On appeal, Bailey asks us to decide four issues:

"1. Does the record contain sufficient evidence to allow a jury to determine whether there was a horizontal boycott of Bailey's, Inc. in violation of Section 1 of the Sherman Act, 15 U.S.C. Section 1?

2. Does the record contain sufficient evidence to allow a jury to determine whether there was a conspiracy to monopolize ... in violation of Section 2 of the Sherman Act, 15 U.S.C. Section 2?

3. Does the record contain sufficient evidence to allow a jury to determine whether there was a violation of the Tennessee antitrust laws, 48 T.C.A. Sections 47–25–101 and 47–25–102 ...?

4. Does the record contain sufficient evidence to allow a jury to find a breach of the covenant of good faith and fair dealing by Windsor?"

Upon review of the record de novo, we conclude that each of these questions must be answered "no." The first issue has been a troublesome one for us, because Bailey did, in our view, present evidence from which a jury could have inferred that the termination of Windsor's sales to Bailey represented a *quid pro quo* for one or more distributors that either offered to increase their own purchases of Windsor products if Windsor stopped dealing directly with Bailey or threatened to stop buying from Windsor if Windsor continued selling to Bailey. There is no evidence that Windsor agreed or sought to agree with any distributor on resale price levels, however, and we are satisfied that there is no basis on which a jury could be permitted to find that Windsor participated in a group boycott of the sort that would be illegal per se under § 1 of the Sherman Act. Accordingly, and because we see little merit in Bailey's remaining arguments, we shall affirm the summary judgment in favor of defendant Windsor.

## I

The depositions filed in this case indicate that approximately 1.5 million replacement guide bars for chain saws are sold in the United States every year. Approximately 8% of these guide bars are manufactured by defendant Windsor. Windsor competes with six or eight other guide bar manufacturers, including Omark Industries, a U.S. company with a market share of around 40%, and Stihl, a German company with a 20% share of the U.S. market.

Windsor is a relative newcomer to the business of manufacturing saw chain, and Windsor's saw chain sales are said to account for less than 5% of the U.S. market. Omark's market share, according to Windsor, is probably 75%. End-users can readily substitute the saw chain and guide bars of one manufacturer for the products of another manufacturer.

Windsor began to sell logging products in the United States during the 1960s. In the five fiscal years ending July 1, 1985, Windsor America's U.S. sales averaged somewhat over $6 million per year. The company has never maintained a large sales force in this country; as of December of 1984, for example, the manager of Windsor America testified that he had only five active salesmen, a part-time sales manager, and one trainee working for him.

Beginning in the mid–1970s, according to the deposition testimony, Windsor began concentrating its sales efforts on a class of customers usually referred to as "distributors." The typical distributor employs its own traveling salespeople and makes a significant part of its sales, if not all of them, to dealers. Dealers, in turn, sell to end-users.

Windsor's distributors have never been precluded from handling competitors' products, as far as the record shows, and it is common for the distributors to carry multiple brands. Windsor distributors operate in whatever geographical area they wish; no territorial restraints are imposed. It appears, indeed, that Windsor does not even enter into written distributorship agreements with its customers.

Windsor publishes suggested dealer prices and suggested retail prices, but does not require adherence to its suggested prices. Neither does Windsor attempt to tell its distributors what customers they may sell to—at least as long as the distributor's customer base includes dealers.

During the early 1980s, the record shows, Windsor maintained sales relationships with approximately 200 distributors in the United States. The number of chain saw dealers in this country—potential customers of the distributors—is said to have exceeded 20,000. The number of lawn and garden dealers, lumber yards and hardware stores that would also be potential customers of the distributors is far larger than that.

Distributors of chain saw products perform a significant warehousing function. This is demonstrated most graphically, perhaps, by the fact that distributors are the sole source from which plaintiff Bailey buys guide bars and saw chain manufactured by Omark Industries, the market leader. Bailey has found that the distributors stock a wider variety of Omark products than does Omark itself.

The traveling salespeople employed by distributors promote the distributors' product lines to the dealers they call on, show the dealers how to sell the distributors' products, and provide information about product changes and warranty and safety matters. Several witnesses indicated that the salesperson's function is an important one. Wendell Walker, for example, the president of a former Windsor distributor called Scotsco, Inc., and a man identified by Bailey's president as a person who "knows what goes on in the industry," gave this testimony:

"Our opinion is that you can add value to the product line you're distributing if you're out there promoting it and showing the dealer how to sell it; showing him the servicing techniques, how to handle the warranty, if it's appropriate. Asking him for the business, in effect.

\* \* \* \* \* \*

In this industry we have bars and chains. There are [conservatively] probably 30 different motor mounts. On a bar there are three different groove widths, there are half a dozen different nose pitches. And there's scarcely one dealer that understands all of that and doesn't get screwed up, let alone the end user.

And it's Scotsco policy we're out there teaching and helping the dealer with this so he could do a better job servicing the end user. That is all without saying anything about the event of [Consumer Product Safety Commission] requirements which even get more complicated. So it is Scotsco's belief and business philosophy that the servicing at the dealer level is necessary.

Q. And salesmen provide this function?

A. That is correct."

Many of Windsor's distributors sell not only to dealers but also to the general public. It is uncontroverted that such distributors—which give better prices to dealers than to the public—generally have salespeople calling on dealers.

Windsor America itself makes no sales at the retail level, and it has only one wholesale price structure. It offers volume discounts, periodic "promotions," and payment of shipping charges on orders above a specified level, but the same prices are available to all Windsor America customers. Both Windsor and its customers think of these prices as distributor prices.

Although most Windsor customers are "servicing distributors"—distributors with a sales force responsible for calling on dealers—Windsor has some customers that do not fit the usual profile. In Iowa, for example, Windsor sells to a buying-cooperative composed of some 150 dealers. The cooperative evidently has no salespeople on the road, but it stages shows at which Windsor and other manufacturers set up booths and display their products to the cooperative's dealer-members. In addition, Windsor admits that as many as four of its conventional distributors currently have no salespeople calling on dealers.

Windsor Machine Company makes some U.S. sales directly, selling mainly to the original equipment market. There is a di-

rect-marketing company named Zip–Penn, Inc., however, that buys guide bars and saw chain directly from Windsor Machine Company, and sells these products, under its own brand name, through catalogues and flyers. Zip–Penn makes mailings to some 350,000 addresses.

Zip–Penn's general manager testified that "[t]he majority of people in the marketplace will not buy by mail." He explained that there is a segment of the retail market that finds it inconvenient or expensive to purchase from dealers, however, and Zip–Penn concentrates on this segment of the market, putting most of its emphasis on mail order sales. Some 75% of Zip–Penn's sales are made by mail to the end-user.

Plaintiff Bailey occupies a market niche similar to that on which Zip–Penn concentrates. Bailey opened a mail order business in Laytonville, California in 1975, and the business grew rapidly. Its gross sales in 1979 were slightly under $1.5 million; by the fiscal year ending September 30, 1983, Bailey's gross sales exceeded $4 million. The company sends out catalogues and fliers to between 40,000 and 50,000 addresses, and roughly 95% of its sales are made by mail.

Bailey sells more Omark guide bars and saw chain than any other brand, and its purchases of Omark products have always been made through distributors. Bailey initially bought Windsor products through distributors too, but in 1978 Windsor America's predecessor company, Waco Industries, Inc., started making direct sales to Bailey. Bailey's annual purchases of guide bars and saw chain from Windsor grew from under $20,000 in 1979 to more than $134,000 in 1983.

Wally Woodard, who worked for Windsor as a salesman during the 1970s, testified that he was instructed as early as 1975 or 1976 not to establish sales relationships with anyone other than distributors. A distributor, as he understood it, was someone who would stock a complete line of Windsor products and who had a salesperson on the road calling on dealers.

Mr. Woodard had a form letter that he would send to prospective customers, telling them what it would take to become a distributor of Windsor products. One of the requirements for being set up as a distributor, Woodard testified, was that the customer place an opening order of $10,000. (This figure was later raised to $15,000, then to $25,000, and finally to $50,000.) Woodard explained that "[w]hat we were trying to do then was eliminate a lot of retailers that would call in and say they wanted to get into the wholesale business and what they were really trying to do was just buy at the distributor price."

A copy of what may have been the last in the series of letters referred to by Mr. Woodard was placed in the record as an addendum to the affidavit of Windsor's Kelly McAnally. (Mr. McAnally joined Waco Industries as a sales representative in 1979 and ultimately became the sales manager of Waco and its successor, Windsor America.) Dated June 14, 1982, and signed by McAnally as manager, the letter read as follows:

"Waco Industries, Inc. Distributor Policy requires specific qualifications to come under the present Distributor price schedule.

Basically these are:

1. Distributor must stock our complete line, including our chain.
2. Initial stocking order, including chain, must be over $50,000 at Distributor cost.
3. Annual purchases must exceed $150,000 at the Distributor net cost.
4. The distributor must have in his employ salesmen covering the chain saw dealers.

It is the policy of WACO INDUSTRIES, INC. to sell our WINDSOR branded products through a Distributor network only."

It is unlikely that many of Windsor's existing distributors would have met these qualifications in 1982. Most existing distributors, for example, never made annual purchases of as much as $150,000. Bailey, for its part, did not employ salesmen to call on chain saw dealers, and thus could not

have qualified to buy as a distributor under the 1982 letter or under the guidelines Mr. Woodard had been given in the mid–1970s.

Mr. McAnally testified that Waco had first established itself east of the Mississippi, and it did not have a full-time representative on the west coast at the time Bailey was set up as a distributor in California. The west coast was then "virgin land" for Waco, and there was "no control" over who got to be a distributor there. "[I]n the beginning," Mr. McAnally said, "just about anybody that would buy anything"—including dealers that did not function as distributors—could buy direct from Windsor.

McAnally was given a list of accounts when he went to work for Waco in 1979, and he made calls on a number of these customers, including Bailey. A sales report dated July 13, 1979, which covered McAnally's recent travels in northern California, said of Bailey that "[t]his man is just a big dealer who thinks he can cover the world[. H]e buys all other product from dist[ributors] such as Omark from R.L. Gould, Specialty Welding, Meyer.... This man has a very bad name with the other dist[ributors] in Calif[ornia] at least the ones I have called on. They have no outside salesman and sell[ ] only over the counter and by the mail."

Bailey's "bad name" among other distributors resulted from the fact that end-users could buy Windsor products more cheaply from Bailey than from dealers who bought through distributors. Bailey's market at this time was primarily the Pacific Northwest—Bill Bailey, the company's co-owner and president, testified that he sold to other portions of the United States only "[o]n a very minimal basis"—and at one time or another, Kelly McAnally testified, every distributor on the west coast "would have had a comment" to him about Bailey.

At a deposition taken in December of 1984 McAnally testified that in the five years since he had been with the company, Windsor had stopped making direct sales to a number of dealers that did not qualify as "servicing distributors." He said that the possibility of recommending a cancellation of direct sales to Bailey had been in his

mind "since the first day I called on them," but he admitted that he never told Bailey this.

Far from letting Bailey know that a cancellation of the sales relationship might be in the offing, McAnally may well have encouraged Bailey to open a branch in the southeastern United States. There is a sharp conflict in the evidence on this point, McAnally testifying that he neither encouraged nor discouraged the opening of a southern branch and Bill Bailey and his wife testifying that McAnally strongly encouraged it. A jury could easily have accepted the Baileys' version.

There was a logging equipment conference in New Orleans in June of 1983, and Bill Bailey testified that the subject of Bailey's opening a branch in the south became "strong" shortly after the conference. Mr. Bailey could not remember if he himself had talked to McAnally about this at New Orleans, but Judith Bailey, his wife, testified that McAnally asked her at the conference if her husband had made a decision about going south. "Not yet," she answered. Mr. McAnally, according to her testimony, then said that he wished she would tell Bill to "get off the fence."

Windsor owned a building in Jackson, Tennessee, that had become vacant in the spring of 1983 when Windsor moved a warehousing operation from Jackson to Dyer, about 30 miles away. (Dyer is the site of a plant at which Windsor manufactures saw chain.) Bill Bailey spoke to McAnally after the New Orleans conference about renting the Jackson facility from Windsor for the proposed southern branch. Bailey went to Jackson to inspect the building, but Windsor decided not to rent it to him. Bailey subsequently located another building in Jackson, and he signed a two-year lease for it. Bill Bailey informed Kelly McAnally in July or August of 1983 that Bailey was definitely going to open a branch in Jackson. Mr. Bailey also disclosed this plan to Dave Braswell of Sunbelt Outdoor Products, Inc., a large North Carolina distributor of which we shall have more to say shortly.

Mr. Bailey testified that he picked Jackson as the site of his southern branch because of Jackson's close proximity to Windsor's warehousing and manufacturing facilities. He had it in mind that Windsor products could be transported to Jackson quickly and cheaply, and in furtherance of this objective Bailey bought a van for use in picking up orders from Windsor.

Two former Windsor employees went on Bailey's payroll in the latter part of 1983 to work at the Jackson branch. Both men had been recommended by Windsor, and Mr. Bailey testified that he would not have hired them but for their expertise in Windsor products.

On October 26, 1983, Bailey gave Windsor a purchase order for more than $100,-000. Part of the order was for shipment to California, but Bailey intended to use the larger part to stock the Jackson operation. Windsor accepted the order, according to Bailey, and reconfirmed it at a meeting held in Tennessee on November 30, 1983.

Bailey was planning to promote both Windsor saw chain and Omark saw chain in an advertisement to be run as the centerfold of Bailey's spring catalogue for 1984. Bill Bailey showed Kelly McAnally the proposed centerfold at the November 30 meeting. Mr. Bailey later testified that McAnally "turned a little white when he looked at the prices we were going to come out [with]—I think he saw that he would probably have problems with other distributors."

One distributor with whom Mr. McAnally might have anticipated problems was Dave Braswell, who runs Sunbelt Outdoor Products, Inc., in Charlotte, North Carolina. McAnally said that Braswell asked him at the New Orleans show if Windsor was selling to Bailey, and McAnally went on to testify that Braswell asked this question more than once during 1983. Braswell himself admitted that it was possible that Sunbelt objected to McAnally about Windsor supplying Bailey's proposed southern branch.

It is Bailey's theory that Braswell not only objected to Windsor's selling to Bailey, but threatened to stop buying from Windsor unless it dropped Bailey as a customer. This theory finds support in a report prepared by a Windsor salesman named Jack Kronenbitter on a sales call on Saw Chain Distributors, Inc., a Windsor distributor in Spokane, Washington.

The Kronenbitter call report, dated July 26, 1983, mentioned that Roger Ahern, the president of Saw Chain, said he had been in Reno, Nevada, with a group consisting of Sunbelt's Dave Braswell, a man named Jim Jeffrey from Sierra Saw Chain in Sacramento, and an Omark distributor from Minnesota. (The Minnesota distributor was not a Windsor customer, and Jeffrey's purchases from Windsor had dwindled to around $13,000 in fiscal year 1983. Ahern and Braswell, on the other hand, were among Windsor's more significant customers; their combined purchases of bars and chain from Windsor amounted to slightly over $100,000 in fiscal year 1983.) Salesman Kronenbitter was not present at the meeting in Reno, but he was given to understand that the distributors had "discussed or rather cussed Bailey's," and, as Kronenbitter wrote, "they claim they are going to drop any supplier that sells to Bailey's." The report added that "Roger [Ahern] promised to write orders to cover Bailey's orders if we would quit supplying him."

Roger Ahern, in his deposition, denied that any of the Reno group had said that he would drop any supplier that sold to Bailey. Ahern also denied promising to write orders to make up for what Bailey had been buying, adding that "I had no idea what Bill Bailey bought and don't usually make commitments where I don't know what the commitment is."[1] Kronen-

---

1. Ahern's major supplier at this time was Omark Industries. Windsor—from which Ahern said he was purchasing only five percent of his requirements—reported bar and chain sales of $62,737 to Ahern in the fiscal year ending in July of 1983. Ahern's purchases from Windsor increased only a very modest $3,886 in fiscal year 1984.

Omark terminated its distributor arrangement with Ahern on March 22, 1984, and in the fiscal year that followed the termination Ahern made bar and chain purchases from Windsor of $257,-

bitter testified, however, that the call report—which he prepared for his superior, Kelly McAnally—accurately reflected what he understood Ahern to have said concerning the meeting in Reno.

When Bailey met with Windsor in Tennessee on November 30, 1983, nothing was said to suggest that Windsor would not be willing to sell products to Bailey for resale through Bailey's southern branch. On the contrary, Bill Bailey testified, McAnally indicated that Windsor was ready to fill the large purchase order Bailey had placed a month earlier.

Whether Braswell, Ahern or any other distributor communicated with Windsor during the week following the November 30 meeting is not disclosed in the record. Under date of December 6, 1983, however, Windsor sent Bailey a letter, signed by McAnally, saying that although Windsor would continue to supply Bailey on the west coast, it would "disrupt our present distributorships" to supply Bailey in the southern market:

"After careful and considerable evaluation of the type business you do in the southern market, I find it will disrupt our present distributorships due to the selling policies you adhere to. We strive to sell only through distributors that in turn support and service the dealer network. Your operation primarily adheres to the end user against our overall policies picked for distributors. Due to our long-term relationship on the West coast, I will be happy to continue service to your operation in that area only. Our Company does not agree that your operation there meets the dealer—distributor function but I feel bound to continue our service in that area due to the many years we have been in business together.

Since 1981 our policy has always been that we would not drop-ship or split orders to locations. And I plan to carry this policy out in relation to your Tennessee operation.

It will be necessary for you to re-evaluate your chain order so that it will meet the optimum footage to one location to earn the maximum discount.

Should you have any questions concerning the above I will be happy to discuss it with you at your convenience."

At his deposition, Mr. McAnally testified that he had received "a few" more complaints about Bailey than usual after it became public knowledge that Bailey was going to open a branch in the southeast. The only specific complaint he could recall was from Dave Braswell of Sunbelt Outdoor Products in North Carolina.

Braswell testified that although Bailey was of no concern to him as long as its only location was in California, he "could" have complained to McAnally about Bailey in 1983, the year when Bailey decided to move to the southeast. Mr. Braswell also acknowledged that Roger Ahern, a personal friend, "could" have complained to him about Bailey's selling practices on the west coast. Mr. Braswell denied having discussed Bailey with Ahern when they were together in Reno, and he denied ever having told Windsor whether it should or should not sell to Bailey.

The sales report mentioning Ahern's meeting with Braswell in Reno says nothing about Braswell's increasing his purchases from Windsor if Windsor ended its relationship with Bailey. The record does indicate, however, that Braswell placed a blanket purchase order with Windsor on December 20, 1983, two weeks after Windsor's refusal to sell to Bailey in the area where Braswell does business. The record also discloses that while Braswell's purchases of bar and chain from Windsor in the fiscal year ending July 31, 1983, came to $39,243, the corresponding figure for fiscal year 1984 was $303,545. Braswell's total purchases from Windsor, including accessories and miscellaneous items, jumped from $65,992 in 1983 to $396,359 in 1984, making Braswell Windsor's largest customer at that point.[2] It was against this back-

---

635. This increase resulted from the fact that Ahern could no longer buy directly from Omark, he testified, and not from the fact that Windsor had stopped selling to Bailey.

2. There was a *decrease* in purchases by Jim Jeffrey, the Sacramento distributor who was also present in Reno. Jeffrey's bar and chain

ground that Mr. Braswell gave the following testimony at his deposition:

"Q. Now, if you and your company were going to increase the volume of your purchases of Windsor products from $65,000 a year to $396,000 a year, you didn't want to have some catalogue discounter selling that product cheaper than you could, did you, in your territory?

A. I wouldn't think so."

Mr. Braswell insisted, nonetheless, that the reason for the large increase in his purchases from Windsor was that Windsor had come out with a new and improved kind of saw chain and had also improved the quality of its guide bars. He mentioned, too, that Windsor had been pressing him for better long-range projections of his needs, so that Windsor could improve the availability of its products. (In so doing, he indicated, Windsor was taking a leaf from Omark's book.)

A jury could have accepted Mr. Braswell's testimony at face value, of course, but anyone persuaded that Braswell and Ahern had in fact discussed Bailey when they met in Reno might also have concluded that Ahern gave Braswell the idea of "writ[ing] orders to cover Bailey's orders if [Windsor] would quit supplying [Bailey,]" or that it was actually Braswell who spoke of doing this. Under either hypothesis, and given Windsor's abrupt change of position between November 30 and December 6, it might be inferred that Braswell made such a promise to Windsor shortly before the December 6th letter was sent.

Be that as it may, the events that followed Windsor's refusal to sell to Bailey in the south are largely uncontroverted. Braswell did, as we have seen, increase his purchases of Windsor products very substantially. Bailey opened its Jackson branch on January 2, 1984, as scheduled, and has continued to operate from that location as well as from its original location in California. The Jackson branch had sales of $813,197 from January of 1984 through March of 1985, but we must assume that Bailey would have had higher sales—and higher profits—if it had been able to supply the Jackson branch with Windsor products purchased at distributor prices from Windsor's nearby facility in Dyer.

Not surprisingly, Bill Bailey was upset by Windsor's unexpected refusal to supply the Jackson branch. After consulting with legal counsel in Memphis, he and his wife met with Kelly McAnally and urged that the refusal be reconsidered. Mr. McAnally promised to take the matter up with Bryon Hodges, the president of Windsor. Bill Bailey telephoned Mr. Hodges on February 2, 1984, and again requested that Windsor reconsider its decision not to sell to Bailey at the southern branch.

On February 7, 1984, Mr. Hodges sent Bailey a letter stating that Windsor had decided not to sell its products directly to Bailey at either of Bailey's locations after May 31, 1984. Hodges' letter asserted, among other things, that Windsor was

"attempting to establish a professional distributor and dealer system in order to advance our reputation in the industry, establish a service and repair network and increase sales. Under this system, we sell through distributors who sell directly to dealers who then sell to and service the ultimate purchasers of our products."

The letter defended the legality of Windsor's position, citing, among other judicial decisions, *United States v. Colgate & Co.,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919), and *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). The letter went on to assure Bailey that Windsor would promptly reply to all purchase orders received before May 31, 1984. "Orders received after that date," the letter said, "will not be filled."

The February 7 termination letter obviously reflects the input of legal counsel, and a memorandum on a meeting between Hodges and McAnally on January 25, 1984, confirms that counsel was to be consulted. The memorandum also states that McAnal-

purchases dropped from $13,191 in fiscal year 1983 to $10,203 in fiscal year 1984.

ly "will put together a draft policy on the type of distribution and dealer network we would like to establish...." Bailey argues, with some force, that the memorandum suggests Windsor had no real policy on distributors before.

Bailey has continued to sell Windsor products since the cut-off, obtaining them through several different distributors. One of these distributors—Lacey–Harmer, of Beaverton, Oregon—is owned, in part, by Windsor itself. Bailey says that there are three distributors, however, from which it has been unable to purchase Windsor products: Sunbelt (Dave Braswell), Saw Chain (Roger Ahern), and Pioneer Northwest, a Portland, Oregon, distributor headed by a man named Clair Johnson.[3] At their depositions, Messrs. Braswell, Ahern and Johnson all denied having refused to sell to Bailey at dealer prices; again, this appears to be a controversy that only a jury could resolve. If any of the three distributors did refuse to sell to Bailey, however, a jury would have no reason to suppose that the refusal was at Windsor's behest. There is absolutely nothing in the record to suggest that Windsor ever tried to preclude any of its distributors from selling to Bailey.

## II

In the exercise of its power to regulate commerce among the several states, Congress declared in § 1 of the Sherman Act, 15 U.S.C. § 1, that every contract, combination or conspiracy that imposes an unreasonable restraint on competition is illegal.[4]

A few types of restraint—price fixing agreements among competitors, e.g.—have such a clear lack of any redeeming virtue that any restraint of that type is conclusively presumed to be unreasonable. Most restraints on competition, however, are not illegal per se; they have been analyzed, historically, under a "rule of reason" approach that permits case-by-case evaluation of their effect on competition. And where the case involves manufactured goods sold in competition with goods of other manufacturers, it is "interbrand competition," as opposed to "intrabrand competition," that is "the primary concern of antitrust law." *Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 724, 108 S.Ct. 1515, 1519, 99 L.Ed.2d 808 (1988), quoting *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 52, n. 19, 97 S.Ct. 2549, 2558, n. 19, 53 L.Ed.2d 568 (1977).

■ In determining whether a particular restraint on competition is illegal per se, it is sometimes important to know whether the restraint is "horizontal" or "vertical."

" '[H]orizontal' restraints [are] agreements between competitors at the same level of market structure, and 'vertical' restraints [are] combinations of persons at different levels of the market structure, such as manufacturers and distributors. Horizontal restraints alone have been characterized as 'naked restraints of trade with no purpose except stifling competition,' ... and, therefore, *per se* violations of the Sherman Act. On the other hand, while vertical restrictions may reduce intrabrand competition by limiting the number of sellers of a partic-

---

**3.** Johnson did not attend the meeting with Ahern and Braswell at Reno. Johnson testified at his deposition that although he had heard of Braswell, he had never spoken to him. Johnson's purchases of bars and chain from Windsor went from $259,465 in 1983 to $269,123 in 1984, an increase of less than 4 percent.

**4.** The actual words of the statute are more sweeping: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." There is a sense in which every commercial contract is a restraint of trade, however, see *National Collegiate Athletic Assn. v.*

*Board of Regents of Oklahoma,* 468 U.S. 85, 98, 104 S.Ct. 2948, 2956, 82 L.Ed.2d 70 (1984), and the Supreme Court has never been willing to read the Sherman Act as declaring every commercial contract illegal. Section 1, the Court has said, was intended to prohibit only "unreasonable restraints of trade." *Id.* This phrase is often used interchangeably with "unreasonable restraints on competition," and the latter formulation may be somewhat more descriptive of what is actually prohibited. See *Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 723, 108 S.Ct. 1515, 1519, 99 L.Ed.2d 808 (1988), and *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977).

ular product, competing for a given group of buyers, they also promote inter-brand competition by allowing a manufacturer to achieve efficiencies in the distribution of its products...." *Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126, 131 (2d Cir.), *cert. denied*, 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978), as quoted in *Crane & Shovel Sales Corp. v. Bucyrus–Erie Co.*, 854 F.2d 802, 805–06 (6th Cir.1988).

It is also important to distinguish between price restraints and non-price restraints. Even in vertical relationships—sales relationships between a manufacturer and its distributors, *e.g.*—agreements to set resale prices have historically been held illegal per se. See *Doctor Miles Medical Co. v. John D. Park & Sons, Co.*, 220 U.S. 373, 404–409, 31 S.Ct. 376, 383–385, 55 L.Ed. 502 (1911). In general, at least, restraints other than agreements to set prices have been tested under the rule of reason.

■ Finally, it is important to distinguish between concerted action and independent action. A manufacturer, for example, is free unilaterally to take the position that it will stop selling to any distributor that fails to observe resale prices announced in advance, see *U.S. v. Colgate*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919), but the manufacturer is not free to stop selling to a price-cutting distributor pursuant to an actual agreement to maintain resale prices.

The significance of these distinctions may be seen in *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), the decision that played a central role in the judgment of the district court in the case at bar. Monsanto was a manufacturer of agricultural herbicides, and Spray–Rite was one of Monsanto's wholesale distributors. Monsanto terminated Spray–Rite's distributorship pursuant to what a jury found was an illegal conspiracy between Monsanto and one or more of its other distributors. The Supreme Court treated the conspiracy as "vertical" in nature, because Monsanto and its distributors occupied different levels of the market structure, but a judgment entered on the verdict in favor of Spray–Rite was affirmed nonetheless because there was ample evidence to support the jury's finding that Spray–Rite's distributorship had been terminated pursuant to "a conspiracy between Monsanto and one or more of its distributors to set resale prices [of Monsanto herbicides]." *Id.* at 757–758, 104 S.Ct. at 1467. It was the concerted action to set resale prices, as we shall see, that was crucial to the result reached by the Supreme Court.

In announcing its decision, the Court rejected a standard of proof that had been applied when the case was before the Court of Appeals for the Seventh Circuit. What the court of appeals had held, in substance, was that "an antitrust plaintiff can survive a motion for a directed verdict if it shows that a manufacturer terminated a price-cutting distributor in response to or following complaints by other distributors." *Id.* at 759, 104 S.Ct. at 1468. This formulation of the standard, the Supreme Court declared, was wrong; a jury may not be permitted to infer the existence of a price-fixing agreement from the existence of complaints or "from the fact that termination came about 'in response to' complaints...." *Id.* at 763, 104 S.Ct. at 1470. If the case is to go to the jury, "something more than evidence of complaints is needed." *Id.* at 764, 104 S.Ct. at 1471. The "something more," in the Court's words, is this: "There must be evidence that tends to exclude the possibility that the manufacturer and non-terminated distributors were acting independently." *Id.*

■ Given the fact that the Court had just finished saying that it would not be enough for the plaintiff to show that its distributorship had been terminated "in response to" complaints from its competitors, this characterization of the "something more" that is necessary would be mystifying if it stood alone. Where the manufacturer terminates the plaintiff's distributorship "in response to" complaints from other distributors, the manufacturer has obviously not acted "independently." In context, however, it is clear that the *Monsanto*

court was suggesting that concerted action to terminate the plaintiff's distributorship could not be held illegal in the absence of further "evidence that reasonably tends to prove that the manufacturer and others 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.'" *Id.,* quoting *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.,* 637 F.2d 105, 111 (3d Cir.1980), *cert. denied,* 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981). And the "common scheme designed to achieve an unlawful objective" can only have been a common scheme to fix or maintain prices.

When the Supreme Court applied the "something more" standard in *Monsanto,* it concluded that "there was sufficient evidence for the jury reasonably to have concluded that Monsanto and some of its distributors were parties to an 'agreement' or 'conspiracy' to maintain resale prices and terminate price cutters." 465 U.S. at 765, 104 S.Ct. at 1471. Although circumstantial evidence of agreements to maintain prices might have sufficed, the court observed that "there was substantial *direct* evidence of agreements to maintain prices." *Id.* (Emphasis by the Court.) The evidence of agreements to maintain prices included testimony that Monsanto had told price-cutting distributors that they would not receive additional supplies of a new herbicide if they did not adhere to Monsanto's "suggested" resale price; evidence that Monsanto went over the heads of non-complying distributors and had their parent companies tell them to conform to Monsanto's prices; evidence that Monsanto threatened to cut off a non-conforming distributor's supply during a period when supplies were tight, thereby using supply as a lever to enforce compliance; and evidence that af-

ter meeting with Monsanto, one of the distributors had issued a newsletter to its dealer-customers stating that "every effort will be made to maintain a minimum market price level" and "Monsanto's company-owned outlets will not retail at less than their suggested retail price to the trade as a whole." *Id.* at 765–66, 104 S.Ct. at 1471.

Once it was determined that "there was evidence of an agreement with one or more distributors to maintain prices," the Court said that the only remaining question was "whether the termination of Spray–Rite was part of or pursuant to that agreement." *Id.* at 767, 104 S.Ct. at 1472. Termination by agreement with competing distributors would not have been illegal if Monsanto had not been engaging in concerted action to maintain prices, but Monsanto could not legally have agreed to terminate Spray–Rite pursuant to an agreement to maintain prices. The evidence in *Monsanto* did, in fact, link the termination to an agreement to maintain prices—and that, as we read the opinion, is why the judgment in favor of Spray–Rite was affirmed.

At least four courts of appeals, including this one, appear to have read *Monsanto* the same way. See *National Marine Electronics Distributors, Inc. v. Raytheon Co.,* 778 F.2d 190 (4th Cir.1985); *Beach v. Viking Sewing Machine Co.,* 784 F.2d 746 (6th Cir.1986); *Garment District Inc., v. Belk Stores Services, Inc.,* 799 F.2d 905 (4th Cir.1986), *cert. denied,* 486 U.S. 1005, 108 S.Ct. 1728, 100 L.Ed.2d 193 (1988); *The Jeanery, Inc. v. James Jeans, Inc.,* 849 F.2d 1148 (9th Cir.1988); *BI–Rite Oil Co. v. Indiana Farm Bureau Co-op Ass'n.,* 908 F.2d 200 (7th Cir.1990).[5]

---

[5] For court of appeals decisions that appear to foreshadow *Monsanto,* see, in addition to *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.,* 637 F.2d 105 (3d Cir.1980), *cert. denied,* 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981), *Packard Motor Car Co. v. Webster Motor Car Co.,* 243 F.2d 418 (D.C.Cir.), *cert. denied,* 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 38 (1957), and *Oreck v. Whirlpool Corp.,* 579 F.2d 126 (2d Cir.) (en banc), *cert. denied,* 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978). *Davis–Watkins Co. v. Service Merchandise,* 686 F.2d 1190 (6th Cir.1982),

*cert. denied,* 466 U.S. 931, 104 S.Ct. 1718, 80 L.Ed.2d 190 (1984), while generally in harmony with the views expressed here, contains a suggestion that although non-price vertical restraints originating in unilateral action by the manufacturer are permissible, the same restraints may be impermissible if they result from concerted action among distributors and manufacturers. To the extent that the latter proposition is inconsistent with the Supreme Court's subsequent decision in *Monsanto,* it is no longer good law.

The first of the above cited cases, *Raytheon,* is the one that probably comes closest to the case at bar on its facts. The lead defendant (Raytheon Company), like defendant Windsor, was a manufacturer that sold its products through a network of approximately 200 independent resellers. The plaintiff, National, was a mail order catalogue retailer that began purchasing Raytheon's products indirectly, but then arranged to purchase direct from the manufacturer. Several of Raytheon's dealers complained. Although Raytheon argued that the dealer complaints were not significant, there was evidence that one major Raytheon dealer not only complained, but contacted other major dealers to alert them to the arrangement with National. One of these other major dealers testified that he notified Raytheon that he would discontinue his Raytheon dealership if Raytheon continued its relationship with National. The dealer also testified that he called other local dealers and urged them to voice their opinions to Raytheon.

After re-examining the marketing structure of its business, Raytheon informed National that no further orders would be accepted. Echoing the contention of plaintiff Bailey here, "National contend[ed] that Raytheon succumbed to the pressure of dealer complaints and, in fact, conspired with its dealers to terminate National's direct selling relationship." *Raytheon,* 778 F.2d at 191. The district court recognized, in *Raytheon,* that there was sufficient evidence to establish that some of the dealers' complaints rose to the level of threats to stop doing business with Raytheon unless it terminated its relationship with National. *Id.* at 192. "The court also found that Raytheon's decision [to terminate] was made in the context of these complaints and that the complaints played a part in the decision." *Id.* The district court nonetheless directed a verdict in favor of Raytheon, and the Court of Appeals for the Fourth Circuit affirmed the judgment on the strength of *Monsanto.*

"The difficulty with National's case," said the court of appeals, "lies in its lack of evidence that reasonably tends to prove that Raytheon and the complaining dealers schemed to terminate National for the purpose of restraining price competition." *Id.* at 192–93. Noting that the allegation of wrongdoing in *Monsanto* was a conspiracy to set resale prices and that in the case before it National was alleging a conspiracy to restrain price competition, the court explained that

"in order to conspire to restrain retail price competition there must be some agreement to set, control, fix, maintain, or stabilize prices. Here there was no agreement. Each dealer, including National, set its own prices. Under these circumstances, whether one chooses to allege that the restraint is vertical or horizontal, the lack of a conspiracy to restrain prices leads to the same result. *Monsanto* bars National's claim." *Id.* at 193.

■ The difficulty with National's case, it seems to us, is a difficulty inherent in plaintiff Bailey's case too. Like National, Bailey can adduce evidence from which it would be reasonable to infer that the defendant manufacturer terminated direct sales to one customer in order to retain or increase the volume of business it did with other customers. But it is not illegal to terminate a sales relationship "to avoid losing the business of disgruntled dealers," *Belk Stores,* 799 F.2d at 909, and "[a] manufacturer is not prohibited from avoiding the potential loss of many of its dealers because it acted in response to price complaints." *Id.,* citing *Monsanto,* 465 U.S. at 764, 104 S.Ct. at 1471. If the defendants in *Raytheon, Belk Stores,* and the *The Jeanery* could not have been found to have entered into agreements to set, control, fix, maintain, or stabilize prices, then we are satisfied, after a very careful examination of the record in the case at bar, that there was no evidence from which a jury could reasonably find that defendant Windsor entered into any such agreement either.

■ Citing *United States v. General Motors Corp.,* 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966), and *Klor's, Inc. v. Broadway–Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), and

expressly disclaiming reliance on any vertical price-fixing claim, Bailey argues that it should have been allowed to go to the jury on the question whether it was the victim of a "horizontal boycott" that violated § 1 of the Sherman Act. We are not persuaded.

*General Motors* was a case in which there was evidence that Chevrolet dealers in the Los Angeles area—dealers that presumably competed with one another—participated in a campaign with their supplier, General Motors, to prevent discount houses and referral services from obtaining Chevrolet cars from any source. Through their trade associations, the dealers entered into what the Supreme Court called a "joint venture" to assist General Motors in making sure that no dealer would do business with the discounters. *Id.* 384 U.S. at 143–144, 86 S.Ct. at 1329–30. This conspiracy to eliminate a class of competitors by joint, collaborative action to terminate all business dealings with members of the disfavored class was held to constitute a per se violation of § 1.

*Klor's* was a case in which the plaintiff, a retail household appliance store, complained that ten national manufacturers and their distributors had conspired to boycott the plaintiff, or to discriminate against it in price, by agreement with a department store chain that competed with the plaintiff. (The defendant manufacturers included such well-known names as Admiral, Emerson, General Electric, Philco, RCA, Tappan, Whirlpool, and Zenith.) The Supreme Court observed that "[g]roup boycotts, or concerted refusals by traders to deal with other traders, have long been held to be in the forbidden category." 359 U.S. at 212, 79 S.Ct. at 709 (footnote omitted). Noting that "[t]his is not a case of a single trader refusing to deal with another, nor even of a manufacturer and a dealer agreeing to an exclusive distributorship," *id.*, the Court

held that the defendants were not entitled to judgment as a matter of law.

Neither *Klor's* or *General Motors* is controlling here. Unlike the manufacturers in *Klor's*, defendant Windsor entered into no agreement with manufacturers of competing brands. Windsor was clearly not a participant in any "group boycott" of the sort condemned in *Klor's*. And unlike the defendants in *General Motors*, defendant Windsor did not conspire with resellers that were in competition with one another to drive another reseller out of business. Although Bailey contends that it was unable to make purchases from three of Windsor's independent distributors (two of which were located a continent apart and obviously did not compete with each other), none of the distributors is a defendant here—and there is not a shred of evidence that Windsor had anything at all to do with, or even knew of, any distributor's refusal to deal with Bailey. The one distributor in which Windsor has an ownership interest *did* sell to Bailey, of course, as did a number of other distributors.

But if there is no evidence that Windsor was a participant in a group boycott that might have been illegal per se, it remains to be considered whether the fact that Windsor may have terminated sales to Bailey in order to retain or increase the business it did with a distributor such as Sunbelt or Saw Chain warrants submission of this case to a jury under "rule of reason" instructions. We conclude that it does not.

No such issue was presented in *Beach v. Viking Sewing Machine Co., Inc.*, 784 F.2d 746 (6th Cir.1986), where the plaintiffs elected to proceed solely on a per se theory.[6] But in *National Marine, Belk Stores*, and *The Jeanery* the defendants were held to be entitled to judgment as a matter of law notwithstanding the absence of any indication that the plaintiffs had waived any right to go to the jury on a rule of reason theory. The courts may well be

---

**6.** Plaintiff Bailey may well have made a similar election in the case at bar. Although Bailey presented a rule of reason argument before the district court, basing its presentation primarily on *Federal Trade Commission v. Indiana Federation of Dentists*, 476 U.S. 447, 106 S.Ct. 2009, 90

L.Ed.2d 445 (1986), that argument has not been renewed here. Indeed, Bailey's opening brief on appeal says that "Bailey's is proceeding in this appeal *solely* on the theory of group boycott...." (Emphasis supplied.)

moving toward the view that vertical restrictions on intrabrand competition ought to be legal per se, at least where the defendant lacks "market power." See Posner, *The Next Step in the Antitrust Treatment of Restricted Distribution: Per Se Legality*, 48 U.Chi.L.Rev. 6 (1981).

As far as the restraint at issue in the case at bar is concerned, we do not believe that a jury would have had any legitimate basis for finding the restraint unreasonable, and thus illegal, under the rule of reason. Windsor's share of the market for replacement guide bars and saw chain is far smaller than the market share enjoyed by at least two of its competitors, and Windsor obviously lacks the "market power" that would enable it to increase price levels in the replacement market. Windsor's decision to stop making direct sales to Bailey cannot have harmed interbrand competition in any meaningful way, and it may well have enhanced such competition. If, for example, Windsor's action resulted in Sunbelt increasing its purchases of Windsor products by almost 600 percent, as Bailey asserts, the Windsor brand would almost inevitably become more competitive among Sunbelt's customers than would have been the case otherwise. And it is interbrand competition, as we have seen, that is the primary concern of the antitrust laws.

### III

The remaining issues need not detain us long.

Section 2 of the Sherman Act, 15 U.S.C. § 2, makes it a criminal offense to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States...." Bailey argues that a jury could have found Windsor guilty of violating this section because it conspired to exclude competition in a part of interstate commerce that is more than *de minimis*. But proof of an illegal conspiracy to monopolize requires proof of a "specific intent to monopolize," *Richter Concrete Corp. v. Hilltop Concrete Corp.*, 691 F.2d 818, 827

(6th Cir.1982), and this record contains no evidence of any such intent on Windsor's part.

 Windsor products, as we have seen, account for less than 10 percent of the market for replacement saw chain products. It is the market as a whole that is relevant, not the market for Windsor products as such, and it is wildly improbable that Windsor could have supposed that a decision to terminate its direct sales to Bailey would somehow help it "monopolize" a market more than 90 percent of which is held by Windsor's competitors.

As to the alleged violation of Tennessee's antitrust laws, the district court brief filed by Bailey in opposition to Windsor's summary judgment motion was devoted almost exclusively to contract and federal antitrust issues. The section on state antitrust law read, in its entirety, as follows:

> "T.C.A. Sections 47–25–101 etc. makes unlawful 'All arrangements, contracts, agreements, trusts, or combinations between persons or corporations made with a view to lessen, or which tend to lessen full and free competition....'
>
> The comments made above concerning the federal antitrust laws are also applicable to the Tennessee antitrust law."

In its brief on appeal Bailey observes that "[t]he Court below gave only passing notice to the allegation by the plaintiff of violation of the Tennessee antitrust laws," merely indicating that the plaintiff had no case under the state statutes for reasons similar to those given for the conclusion that the plaintiff had no case under federal antitrust law. The district court's treatment of the state antitrust law issue seems appropriate under the circumstances.

 Subsequent to the filing of Bailey's brief in the district court, the Attorney General of Tennessee joined in an amicus brief filed in the United States Supreme Court to support what proved to be the losing side in *Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 108 S.Ct. 1515, *supra*. The position taken by the Tennessee Attorney General in that case does not persuade us that we should

direct the district court to revisit its decision in the case at bar.

Finally, Bailey argues that a jury should have been allowed to find that Windsor violated a covenant of good faith and fair dealing in encouraging Bailey to spend time and money setting up a southern branch near Windsor's Tennessee facility, only to refuse to supply the new branch a few weeks before the opening. If Windsor's Mr. McAnally had been entertaining the possibility of a termination since 1979, he obviously ought, in good conscience, to have warned Bailey in the summer of 1983 that continuation of the sales relationship was not to be taken for granted. But, as the district court found, Bailey could point to no distributorship agreement with terms sufficiently definite to be enforced under Tennessee law. Absent an enforceable agreement, there was nothing to which an implied covenant of good faith and fair dealing could attach. Bailey makes no promissory estoppel argument on appeal, and its assignment of error is not well taken.

The judgment of the district court is AFFIRMED.