78 F.3d 1079
 1996-1 Trade Cases P 71,336
 Mangala V. BETKERUR, M.D.; Canton Neonatology, Inc.,
Plaintiffs-Appellants,
v.
AULTMAN HOSPITAL ASSOCIATION; Martha W. Magoon, M.D.;
Northeastern Ohio Perinatal Services, Inc.; Thomas Hoover,
M.D.; George R. Dakoske, M.D.; William M. Holls, M.D.;
Stark County Women's Clinic, Inc.; Atrium South OB/GYN,
Inc.; G. Robert Fitz, M.D.; Daniel W. Adams, M.D.,
Defendants-Appellees.
 No. 94-3673.
 United States Court of Appeals,
Sixth Circuit.
 Argued Oct. 3, 1995.
Decided March 15, 1996.
 
 On Appeal from the United States District Court for the Northern District of Ohio; George W. White, Chief Judge.
 
 
 1
 Alan C. Witten (briefed), McShane, Breitfeller & Wittne, Columbus, OH, Louis A. Jacobs (argued and briefed), Upper Arlington, OH, for Betkerur, Canton Neonatology, Inc.
 
 
 2
 Walter J. Rekstis, III (briefed), Squire, Sanders & Dempsey, Cleveland, OH, Joseph J. Feltes, Buckingham, Doolittle & Burroughs, Canton, OH, Douglas J. Colton (argued and briefed), Verner, Liipfert, Bernhard, McPherson & Hand, Washington, DC, for Aultman Hospital Association.
 
 
 3
 Walter J. Rekstis, III, Squire, Sanders & Dempsey, Cleveland, OH, Karen S. McQueen (argued and briefed), Fred J. Haupt, Krugliak, Wilkins, Griffiths & Dougherty, Canton, OH, for Magoon.
 
 
 4
 Karen S. McQueen, Fred J. Haupt, Krugliak, Wilkins, Griffiths & Dougherty, Canton, OH, for Northeastern Ohio Perinatal Services, Inc.
 
 
 5
 Walter J. Rekstis, III, Timothy F. Sweeney, Squire, Sanders & Dempsey, Cleveland, OH, for Hoover, Stark County Women's Clinic, Inc., Fitz, Adams.
 
 
 6
 Timothy T. Reid (briefed), Denise M. Weaver, Reid, Berry & Stanard, Cleveland, OH, for Dakoske, Atrium South OB/GYN, Inc.
 
 
 7
 Joseph J. Feltes, Buckingham, Doolittle & Burroughs, Canton, OH, Douglas J. Colton, Verner, Liipfert, Bernhard, McPherson & Hand, Washington, DC, for Holls.
 
 
 8
 Before: SILER and DAUGHTREY, Circuit Judges; ROSEN, District Judge.*
 
 
 9
 ROSEN, District Judge.
 
 
 10
 Plaintiff-Appellant Mangala V. Betkerur, M.D. ("Appellant"), is a neonatologist who initially brought this action in 1986.[1] After various motions to dismiss and discovery matters were resolved, Appellant filed her Second Amended Complaint on February 27, 1992, alleging violations of federal civil rights and antitrust laws, and also asserting antitrust, tortious conduct, and breach of contract claims under Ohio law.
 
 
 11
 In her complaint, Appellant asserted a federal antitrust violation based on an alleged agreement among the Defendant-Appellee obstetrician-gynecologists ("OB/GYNs")[2] to boycott Appellant's practice by referring all of their patients to Defendant-Appellee Martha W. Magoon, M.D., another neonatologist who, like Appellant, practices at Defendant-Appellee Aultman Hospital. Appellant's federal civil rights claims allege discrimination on the basis of race and national origin; Appellant contends that Dr. Magoon, a white, American-born neonatologist, was appointed Director of Neonatology over the better-qualified Appellant based on Appellant's race and Indian origin. The defendants named in Appellant's suit include: (1) Aultman Hospital in Canton, Ohio, at which Appellant has staff privileges, (2) six physicians who also have privileges at Aultman Hospital, and (3) three medical corporations with which some of the defendant physicians are affiliated.
 
 
 12
 In the court below, Defendants-Appellees moved for summary judgment on all claims. The district court, adopting a magistrate judge's report and recommendation in its entirety, granted summary judgment on the federal claims and declined to retain jurisdiction over the supplemental state law claims. Appellant now appeals the grant of summary judgment to Appellees on her federal claims. Because we find that Appellant has failed to establish her federal antitrust and discrimination claims as a matter of law, we affirm.
 
 I. FACTUAL BACKGROUND
 
 13
 Upon deciding to establish an in-house neonatal intensive care unit ("NICU"), Aultman Hospital extended a staff appointment and neonatology privileges to Appellant, a board-certified neonatologist,[3] in 1981. Appellant describes herself as a "tan-skinned Indian," and she received her medical degree in India prior to immigrating to the United States. Her initial appointment at Aultman guaranteed her a minimum income of $75,000 per year. At the time Appellant joined Aultman's staff, the hospital's perinatal facilities were designated as "Level II" by the State of Ohio,[4] and that designation continues to the present.
 
 
 14
 In 1982, Aultman Hospital granted staff privileges to two additional neonatologists: (1) Dr. Alwan, who was born and educated in Egypt, and who primarily practiced at Timken Mercy Medical Center, also in Canton; and (2) Defendant-Appellee Dr. Magoon, who is white, was born and educated in the United States, and is, like Appellant, board-certified in neonatology.
 
 
 15
 From the outset, there was a certain amount of tension in the relationship between Appellant and Dr. Magoon. Appellant initially offered to make Dr. Magoon her employee, but Magoon declined and instead entered into an agreement directly with Aultman. Appellant found this noteworthy because she felt that she was the established director of the NICU. Moreover, Appellant contends that, despite their comparable training, Dr. Magoon was given a more favorable compensation arrangement upon joining Aultman than Appellant then enjoyed; only upon Appellant learning of this discrepancy was she able to obtain the same arrangement for herself. Appellant further maintains that Dr. Magoon's appointment was "facilitated by her family's professional and social ties to the Hospital's leadership." (Appellant Br. at 14). Appellant also contends that her efforts to create a higher public relations profile for the hospital's NICU were rebuffed, but that Dr. Magoon's presence was prominently advertised around the community shortly after she joined the Aultman staff. Specifically, Appellant alleges that the hospital's president told her that she was "not a good selling person." (J.A. at 532).
 
 
 16
 The referral system that was employed when Dr. Magoon joined the hospital's staff also contributed to the tension in the relationship between Appellant and Magoon. Neonatologists derive their patients, and hence their income, primarily from referrals from OB/GYNs. Initially, Appellant, Dr. Magoon, and Dr. Alwan operated under a "cross-coverage" agreement, which provided for around-the-clock neonatal coverage distributed among the three physicians. Under this agreement, OB/GYNs were required to refer their patients to the neonatologist who was designated as "on-call" at the time of the referral. The OB/GYNs, therefore, could not refer their patients to a preferred physician; rather, referrals to neonatologists were dictated by the schedule established by the neonatologists.
 
 
 17
 A. Dissolution of the Cross-Coverage Agreement
 
 
 18
 Appellant's claims in the instant litigation arise in large part from the events surrounding the dissolution of the cross-coverage agreement among the neonatologists. Both Dr. Magoon and the referring OB/GYNs evidently grew increasingly dissatisfied with the existing arrangement. Accordingly, during the years of 1984 and 1985, they took various steps that eventually led to the termination of the cross-coverage agreement in the fall of 1985.
 
 
 19
 According to Appellant, Dr. Magoon found the agreement unsatisfactory because it limited the number of referrals, and thus the amount of money, that she believed she could obtain under a different system. As evidence of Dr. Magoon's financial motives, Appellant points to Dr. Magoon's efforts during the summer of 1984 to obtain a new contractual arrangement with Aultman Hospital. In particular, a July 27, 1984, letter from Dr. Magoon to Richard Pryce, the President of Aultman Hospital, discusses a proposed new contract; the letter states that, due to the limitations imposed by the existing cross-coverage agreement, Dr. Magoon's medical corporation would have to "significantly increase" its per-day fee for services in order to generate the target level of income called for in the proposed contract. (J.A. at 668-69). The letter further states that, should Dr. Magoon be able to assume some of the referrals currently taken by Appellant under the cross-coverage agreement, this fee increase could be avoided. (J.A. at 669). Finally, Dr. Magoon's letter expresses concern about the reaction of patients to a significant increase in the per-day fees, and the "adverse public relations" that might follow. (J.A. at 669).
 
 
 20
 Appellees disagree with this characterization of their reasons for seeking to terminate the cross-coverage agreement. In her deposition, Dr. Magoon cites "differences in our philosophies of care" as her reason for seeking dissolution of the agreement. (J.A. at 637). For their part, the OB/GYNs contend that they objected to the cross-coverage agreement because it prevented them from exercising their individual preferences for a particular neonatologist who more closely shared their individual approaches to patient care. Specifically, the individual Defendant-Appellee OB/GYNs cited Magoon's greater reliability "in matters of professional judgment" and her more skillful interactions with both the OB/GYNs and their patients as their primary reasons for preferring Magoon over Appellant. (J.A. at 287 (affidavit of Dr. Hoover); J.A. at 352 (affidavit of Dr. Dakoske); J.A. at 723, 726 (deposition testimony of Dr. Holls); J.A. at 292-93 (affidavit of Dr. Fitz); J.A. at 282 (affidavit of Dr. Adams)).
 
 
 21
 Based largely on these expressions of dissatisfaction with the existing arrangement, the hospital convened an ad hoc committee to study perinatal care at Aultman. This committee issued a report on March 21, 1985, recommending that Aultman should designate a single neonatologist as the Director of the NICU, with the other neonatologists reporting to that Director. (J.A. at 354-55). The hospital's Department of Pediatrics objected to this report and issued its own report contending that "[a]ppointment of a permanent director ... would be demoralizing." (J.A. at 868-69). The OB/GYNs in turn objected to the Pediatrics report, and they, along with Dr. Magoon, sent a letter to Aultman on June 14, 1985, stating that they had "developed an informal multidisciplinary committee ... to deliberate issues and guide us in future perinatal developments." (J.A. at 613). To reinforce their position, the OB/GYNs--specifically, Defendants-Appellees Hoover, Dakoske, and Holls--sent a letter to the hospital on June 18, 1985, stating that effective September 1, 1985, they would begin referring all of their patients to Dr. Magoon in spite of the cross-coverage agreement. Magoon subsequently agreed to accept these referrals, and notified Appellant in the fall of 1985 that she was terminating the cross-coverage agreement.
 
 B. Appointment of a Director of Neonatology
 
 22
 Acting upon the recommendation of its ad hoc committee, Aultman Hospital contracted with an outside consultant, Christopher & Long, to identify the best candidates for the position of Director of Neonatology at Aultman. This outside consultant issued a report in December, 1985, recognizing a "major communication gap ... between the two primary neonatologists" at Aultman, and recommending that Aultman immediately commence contract negotiations with Magoon as the "in-house candidate of choice." (J.A. at 359-63). The report also mentioned one potential outside candidate, describing him as "a young family man, American born, American trained," and recommended that Aultman schedule an interview with this outside candidate. (J.A. at 361, 363).
 
 
 23
 The report from Christopher & Long cited three reasons for recommending Magoon over Appellant: (1) the "nationally recognized" training programs Magoon had established, (2) Magoon's demonstrated ability to "garner[ ] overwhelming support in the referral community," and (3) Magoon's perceived greater ability to obtain a Level III designation for Aultman's perinatal program. (J.A. at 362). The report also noted that the recommendation of Magoon resulted from "areas in which Dr. Magoon excelled rather than in any negatives regarding Dr. Betkerur." (J.A. at 362).
 
 
 24
 On December 23, 1985, a search committee convened by the hospital to select a Director of Neonatology met to discuss the Christopher & Long report. Of the Defendant-Appellee physicians, only Dr. Adams sat on this search committee. The committee reviewed the report and heard presentations from the two in-house candidates, Appellant and Dr. Magoon. (J.A. at 368). The committee then voted to accept the Christopher & Long recommendation to immediately begin negotiations with Magoon, but rejected a proposal that Appellant be offered the position if an agreement could not be reached with Magoon. (J.A. at 368-69). Finally, the committee voted to interview the outside candidate only if an agreement could not be reached with Magoon by January, 1986. (J.A. at 369).
 
 
 25
 Shortly after this meeting of its search committee, Aultman entered into a contract with Dr. Magoon appointing her Director of Neonatology. Appellant retained all her privileges to practice at Aultman, continues to practice there, and continues to receive referrals, "including referrals from the defendant groups she says have boycotted her." (Appellee Br. (Stark County Women's Clinic and Drs. Fitz, Adams, and Hoover) at 11).
 
 
 26
 Appellant commenced the instant action in 1986, asserting two types of federal claims and various state law claims. In the first of her federal claims, she alleges that the decision of the OB/GYNs to refer all of their patients to Dr. Magoon was an illegal "group boycott" in violation of antitrust law. Next, she contends that the selection of Dr. Magoon as Director of Neonatology was improperly based on considerations of race and national origin.
 
 II. THE DISTRICT COURT'S DECISION
 
 27
 On December 1, 1993, Magistrate Judge Streepy issued a report recommending that Appellees' motion for summary judgment be granted with respect to Appellant's federal claims, and that Appellant's state law claims be dismissed for lack of jurisdiction. On May 20, 1994, Judge White of the District Court for the Northern District of Ohio issued a memorandum and order addressing Appellant's objections to the magistrate's report and adopting that report in its entirety.
 
 
 28
 Regarding Appellant's antitrust claim under the Sherman Act, the magistrate judge rejected Appellant's argument that the agreement among the Defendant-Appellee OB/GYNs to refer their patients to Dr. Magoon constituted a "group boycott," and thus was a per se violation of antitrust law. Instead, because the "product" at issue in this case is professional physician services, and because the OB/GYNs appealed to medical considerations to justify their decisions to refer patients only to Magoon, the magistrate judge found that "rule of reason" analysis should be applied to determine whether the physicians' "boycott" truly had adverse anticompetitive effects.
 
 
 29
 The magistrate judge then noted that Appellant had not even attempted such a "rule of reason" analysis. Moreover, the magistrate judge found no evidence in the record indicating that the alleged boycott had an anticompetitive effect. In particular, Appellant retained her privileges at Aultman, and remained free to compete for patient referrals. Finally, the magistrate found no evidence of a price-fixing component to the alleged boycott. The magistrate judge thus concluded that summary judgment should be entered on Appellant's antitrust claim.
 
 
 30
 Turning to Appellant's Title VII claim against Aultman Hospital, the magistrate judge first noted that Appellant had established a prima facie case of discrimination based on race and national origin, and that Aultman had responded with the legitimate, non-discriminatory reason of reliance on the outside consultant's report recommending Dr. Magoon over Appellant for the position of Director of Neonatology. The magistrate judge then dismissed Appellant's various arguments that Aultman's stated reason was pretextual. First, the magistrate judge noted that several of the discriminatory remarks allegedly made were not attributable to decisionmakers; for example, the comment in the outside consultant's report regarding an "American born, American trained" outside candidate was not adopted by any Aultman decisionmaker. Next, the alleged remark of Richard Pryce, an Aultman decisionmaker, that Appellant was "not a good selling person" was too ambiguous to charge Aultman with a discriminatory motive. The magistrate judge also found that Appellant's charge of nepotism in the appointment and promotion of Dr. Magoon, even if true, would not constitute evidence of a Title VII violation.
 
 
 31
 Finally, the magistrate judge considered Appellant's § 1981 claims. First, regarding the contention that Aultman Hospital discriminated against Appellant in its failure to appoint her as Director of Neonatology, the magistrate judge found that the same factors that defeated Appellant's Title VII claim also defeated her § 1981 claim. Next, of the individual Defendants-Appellees, only Dr. Adams was involved in the decision to promote Dr. Magoon over Appellant. Because the magistrate judge found that Defendant-Appellee Adams' stated basis for his decision--namely, that he voted for Magoon because he felt she was the best candidate for the position--was not shown by any evidence to be pretextual, the § 1981 claim against Adams necessarily failed.
 
 
 32
 Appellant's remaining § 1981 claims were based on the individual Defendant-Appellee OB/GYNs' refusals to refer patients to her. The magistrate judge first observed that the hospital was not a party to this alleged boycott, and concluded that a § 1981 claim could not be sustained against Aultman on this basis. Turning to the individual physicians, the magistrate judge found that their decisions not to refer to Appellant were based on differences in philosophies of care, which constituted a legitimate non-discriminatory reason for their actions. In response, Appellant offered only allegations that nepotism played a part in the OB/GYNs' referral decisions. As with the Title VII claim, the magistrate judge concluded that nepotism, standing alone, does not suffice to establish racial animus. Accordingly, the magistrate judge recommended summary judgment on Appellant's § 1981 claims.
 
 III. ARGUMENTS OF THE PARTIES
 
 33
 Appellant has identified two issues on appeal. First, Appellant asserts that the magistrate judge improperly invoked a "learned professions" exception to the general rule that group boycotts constitute per se violations of federal antitrust law. Appellant contends that this "learned professions" exception has been rejected by the Supreme Court, and that the magistrate judge identified no other basis for applying a "rule of reason" analysis rather than finding a per se antitrust violation. Appellant therefore concludes that the magistrate judge's decision to apply the "rule of reason" was erroneous.
 
 
 34
 Next, in support of her discrimination claims, Appellant argues that she produced sufficient evidence to raise an inference that Appellees' asserted grounds for their decisions were pretextual. In particular, Appellant contends that the district court failed to consider the totality of the evidence of discriminatory motive in a "synergistic fashion," and that the court improperly weighed this evidence rather than considering whether it was sufficient to raise an inference of discriminatory intent. Appellant also contends that the Supreme Court's decision in St. Mary's Honor Center v. Hicks, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), demonstrates that a plaintiff can prevail in a discrimination claim simply by discrediting the defendant's articulated non-discriminatory reasons.
 
 
 35
 In response to Appellant's antitrust argument, Appellees deny that the magistrate judge invoked the admittedly discredited "learned professions" exception as his sole basis for applying a "rule of reason" analysis. Moreover, regardless of the magistrate judge's reasoning, Appellees assert that "rule of reason" analysis is proper where, as here, the alleged boycott does not lie within the class of boycotts that are presumed to have adverse anticompetitive effects. Because decisions within the medical profession typically are based on professional standards of care rather than economic considerations, Appellees argue that it would be inappropriate to find a per se violation instead of engaging in a thorough "rule of reason" analysis. Because Appellees' alleged boycott should be subjected to "rule of reason" analysis, and because Appellant still has not attempted to show that her antitrust claim can withstand such an analysis, Appellees conclude that summary judgment was properly granted.
 
 
 36
 Appellees offer a simple argument in support of the grant of summary judgment on Appellant's discrimination claims: the magistrate judge and the district court both properly found that Appellant's evidence of discriminatory intent, consisting of a handful of isolated or vague remarks, was insufficient to show that Appellees' reasons for their decisions were pretextual. Consequently, because the lower court committed no error in its evaluation of Appellant's discrimination claims, Appellees maintain that the district court's award of summary judgment should be affirmed.
 
 IV. ANALYSIS
 
 37
 A. The Standards Governing Review of a Grant of Summary Judgment
 
 
 38
 In reviewing a grant of summary judgment, we apply the same standards as those which controlled the district court's determination. Berlin v. Michigan Bell Tel. Co., 858 F.2d 1154, 1161 (6th Cir.1988). The pertinent Federal Rule holds that summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).
 
 
 39
 Three 1986 Supreme Court decisions-- Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)--ushered in a "new era" in the standards of review for a summary judgment motion. These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[5] According to the Celotex Court:
 
 
 40
 In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.
 
 
 41
 Celotex, 477 U.S. at 322, 106 S.Ct. at 2552.
 
 
 42
 After reviewing the above trilogy, this Court endorsed a set of principles to be applied to motions for summary judgment:
 
 
 43
 [*] Cases involving state of mind issues are not necessarily inappropriate for summary judgment.
 
 
 44
 [*] The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.
 
 
 45
 [*] This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case. * * *
 
 
 46
 [*] The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."
 
 
 47
 [*] The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.
 
 
 48
 [*] The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is "implausible."
 
 
 49
 See Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479-80 (6th Cir.1989) (footnotes with citations omitted). We will apply these principles in our de novo review of the district court's grant of summary judgment to Appellees.
 
 
 50
 B. The District Court Properly Applied "Rule of Reason" Analysis to Appellant's Federal Antitrust Claim
 
 
 51
 Appellant's federal antitrust claim is based on § 1 of the Sherman Act, which states in pertinent part:
 
 
 52
 Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States ... is declared to be illegal.
 
 
 53
 15 U.S.C. § 1. Appellant alleges that the Defendant-Appellee OB/GYNs, acting in concert with Dr. Magoon, illegally boycotted Appellant by refusing to refer their patients to her. As a result of this alleged boycott, Appellant contends that patients have been deprived of a preferred supplier of neonatal services, the output of neonatal services has been restricted, and fees for those services have risen to high, non-competitive levels.
 
 
 54
 In their appellate briefs, the parties agree that the dispositive issue in Appellant's antitrust claim concerns the proper analysis to be applied to that claim. As we have previously explained:
 
 
 55
 The Supreme Court has set out two kinds of analysis to examine whether agreements run afoul of antitrust laws: the first employs a presumption that an agreement is an antitrust violation, thus invoking a per se illegality rule to classify the agreement; the second, called "rule of reason" analysis, "requires the factfinder to decide whether under all the circumstances of the case the restrictive practice imposes an unreasonable restraint on competition."
 
 
 56
 Lie v. St. Joseph Hosp., 964 F.2d 567, 569 (6th Cir.1992) (quoting Arizona v. Maricopa County Medical Soc'y, 457 U.S. 332, 343, 102 S.Ct. 2466, 2472, 73 L.Ed.2d 48 (1982)). Appellant contends that per se analysis should apply to the alleged "group boycott" by the Defendant-Appellee OB/GYNs. Consistent with this contention, Appellant has not produced the detailed evidence that would be necessary to support a "rule of reason" analysis of her claim.
 
 
 57
 The Supreme Court extensively discussed the reasoning behind the per se rule in Arizona v. Maricopa County Medical Soc'y, 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982). In that case, the defendant medical societies had established a schedule of maximum fees that their member physicians agreed to accept as payment in full from patients insured under plans approved by those societies. 457 U.S. at 339, 102 S.Ct. at 2470. The Court found that per se analysis applied to this price-fixing agreement, and rejected the attempts of the medical societies to distinguish their fee schedules from more conventional price-fixing agreements. 457 U.S. at 348-54, 102 S.Ct. at 2475-78.
 
 
 58
 The Court first reviewed the history of the per se rule, and cited four underlying justifications for eschewing full "rule of reason" analysis in some cases. First, the Court reasoned that "elaborate inquiry into the reasonableness of a challenged business practice entails significant costs," and that application of a per se rule bypasses this costly inquiry when rudimentary economic principles strongly suggest that particular business practices--for example, price-fixing agreements--will nearly always have anticompetitive effects. 457 U.S. at 343, 351, 102 S.Ct. at 2472, 2476-77. Moreover, even if sophisticated economic analysis might demonstrate that a facially suspect practice in fact was procompetitive, the Court expressed doubt whether the judiciary could confidently identify and predict such positive effects. 457 U.S. at 343, 102 S.Ct. at 2472-73.
 
 
 59
 Second, the Court cited judicial convenience as a justification for a per se rule. The Court reasoned that "[o]nce experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it, it has applied a conclusive presumption that the restraint is unreasonable." 457 U.S. at 344, 102 S.Ct. at 2473. Third, the Court noted the need for certainty within the business community that courts will disapprove of certain types of business practices. 457 U.S. at 344, 102 S.Ct. at 2473. Finally, the Court reasoned that congressional action to amend antitrust law is facilitated by unequivocal judicial pronouncements that certain business practices are per se antitrust violations while others are not; judicial consistency in applying a per se rule recognizes "the respective roles of the Judiciary and the Congress in regulating the economy." 457 U.S. at 354, 102 S.Ct. at 2478.
 
 
 60
 Turning to the case before it, the Court found that the defendant medical societies could not escape per se invalidation of their price-fixing agreement. The Court summarily rejected any attempt to distinguish between maximum and minimum price fixing, noting that price competition is restrained in either case. 457 U.S. at 348, 102 S.Ct. at 2475. The Court also refused to consider any procompetitive justifications for the maximum fee schedules, reasoning that "[t]he anticompetitive potential inherent in all price-fixing agreements justifies their facial invalidation even if procompetitive justifications are offered for some." 457 U.S. at 351, 102 S.Ct. at 2476-77. Finally, the Court rejected the medical societies' argument that the per se rule should not apply to practices within the medical profession because courts do not have sufficient antitrust experience in the health care industry to confidently predict anticompetitive effects. 457 U.S. at 349, 102 S.Ct. at 2475. Instead, the Court found that the per se rule need not be separately justified in each industry if the practice in question, such as price-fixing, is very likely to have anticompetitive effects. 457 U.S. at 349-51, 102 S.Ct. at 2475-76. Significantly, though, the Court suggested that the result might be different if an agreement among professionals to engage in a particular practice were "premised on public service or ethical norms." 457 U.S. at 349, 102 S.Ct. at 2475.
 
 
 61
 Maricopa County demonstrates that a court's choice between a per se rule and "rule of reason" analysis is driven largely by analogy. A court should find a per se antitrust violation only when prior cases have established the anticompetitive effects of a sufficiently similar business practice. Accordingly, Appellant contends that the alleged OB/GYN boycott in this case is the type of agreement[6] that courts have found to be a per se antitrust violation without need for detailed economic analysis. In particular, Appellant attempts to fit the actions of the OB/GYNs into three categories of business practices that have been invalidated under the per se rule in prior cases: group boycotts, price-fixing agreements, and agreements among horizontal competitors. We find, however, that each of these analogies is flawed.
 
 
 62
 First, Appellant classifies the decisions of the OB/GYNs to refer their patients to Dr. Magoon as a "group boycott." Appellant then cites the classic group boycott case, Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), which involved a claim by the plaintiff retail appliance store that a competitor chain of stores had conspired with the manufacturers and distributors of various appliances not to sell to the plaintiff or to sell only at unfavorable terms. The Supreme Court found that this agreement was a per se antitrust violation, reasoning that "[g]roup boycotts, or concerted refusals by traders to deal with other traders, have long been held to be in the forbidden category." 359 U.S. at 212, 79 S.Ct. at 709. The Court was particularly concerned about the "monopolistic tendency" of the agreement, because its effect would be to "drive[ ] [the plaintiff] out of business as a dealer in the defendants' products." 359 U.S. at 213, 79 S.Ct. at 710.
 
 
 63
 In contrast, Appellant here has not been driven out of business by the boycott; she continues to practice at Aultman, and in fact continues to receive referrals from the OB/GYNs who allegedly are boycotting her. More significantly, the OB/GYNs would stand to gain nothing financially by driving Appellant out of her practice. Because they neither share in the fees charged by the neonatologists nor receive any other compensation for their referrals, they lack any economic incentive to refer patients to one neonatologist versus another. Consequently, even if the OB/GYNs made a concerted decision not to refer patients to Appellant, the situation here does not raise the same concerns as in Klor's, where a successful boycott would have resulted in a monopoly in which all of the defendants--the manufacturers, distributors, and competitor retailer--could have benefitted financially at the expense of consumers.
 
 
 64
 In this case, only Dr. Magoon would potentially gain from the alleged boycott by having a competitor removed from the neonatology "market." Given the absence of any mechanism by which she could pass along her financial gain to the OB/GYNs, Dr. Magoon would have to exert a non-economic influence of some sort in order to persuade the OB/GYNs to join in her "group boycott." Accordingly, in order to establish the relevance of Klor's, Appellant would have to produce some evidence that Dr. Magoon actively sought an agreement among the OB/GYNs to refer patients only to her, and that she exercised some sort of power over the OB/GYNs that enabled her to secure this agreement.
 
 
 65
 We find that the evidence simply fails to support such a theory. Although the record indicates, not surprisingly, that Dr. Magoon indeed was interested in obtaining more referrals, even if to the detriment of Appellant, no evidence suggests that Dr. Magoon possessed any power over the OB/GYNs that would enable her to realize this desire. In her efforts in the summer of 1984 to secure a more favorable contract, Dr. Magoon noted the relationship between the fees she would have to charge and the continued existence of the cross-coverage agreement, but she did not suggest that she had any control over the continuation of that agreement.[7] Moreover, although both the OB/GYNs and Dr. Magoon apparently wished to see the cross-coverage agreement abandoned, and although they may well have discussed this shared desire prior to the termination of the agreement, no evidence suggests that Dr. Magoon caused the OB/GYNs to seek dissolution of the agreement by any means other than providing neonatal care that the OB/GYNs judged to be preferable. Indeed, the evidence suggests, if anything, that the OB/GYNs were the driving force behind the dissolution of the cross-coverage agreement, and that they sought to persuade Dr. Magoon to accept referrals outside that agreement.
 
 
 66
 Having failed to suggest any economic motivation for a boycott, Appellant points to language in Supreme Court cases indicating that the primary concern raised by group boycotts is not economic, but rather that such boycotts "deprive at least some consumers of a preferred supplier." Summit Health, Ltd. v. Pinhas, 500 U.S. 322, 337, 111 S.Ct. 1842, 1851, 114 L.Ed.2d 366 (1991) (Scalia, J., dissenting); see also Federal Trade Comm'n v. Indiana Fed'n of Dentists, 476 U.S. 447, 459, 106 S.Ct. 2009, 2018, 90 L.Ed.2d 445 (1986) (noting that "refusal to compete" agreements "limit[ ] consumer choice by impeding the 'ordinary give and take of the market place' " (citations omitted)). Appellant then contends that the OB/GYNs' "group boycott" has diminished consumer choice among neonatologists.
 
 
 67
 There are two obvious problems with this argument. First, accepting Appellant's apparent premise that the relevant "consumers" here are the parents of babies in need of neonatal care, Appellant has produced no evidence that the desires of those parents who prefer her have been thwarted by the alleged OB/GYN boycott. From all that appears in the record, the OB/GYNs would continue to honor any specific request for a particular neonatologist. Next, and more importantly, because it is the referring OB/GYN who typically determines which neonatologist will treat a particular baby, the OB/GYNs appear to be the relevant "consumers" in this case. Viewed in this way, the dissolution of the cross-coverage agreement actually enhanced consumer choice. Under the cross-coverage agreement, the OB/GYNs could not choose among neonatologists; each referral was covered by the neonatologist who happened to be "on call" at the time. In contrast, once the cross-coverage agreement was terminated, the OB/GYNs were free to refer their patients as determined by their own individual preferences.
 
 
 68
 In short, even accepting Appellant's contention that the OB/GYNs decided collectively to refer their patients to Dr. Magoon, the economic circumstances surrounding that decision simply do not give rise to the concerns expressed in cases finding that group boycotts are per se antitrust violations. As stated by the Supreme Court:
 
 
 69
 [T]he category of restraints classified as group boycotts is not to be expanded indiscriminately, and the per se approach has generally been limited to cases in which firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor.... Moreover, we have been slow ... to extend per se analysis to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious.
 
 
 70
 Federal Trade Comm'n v. Indiana Federation of Dentists, 476 U.S. 447, 458-59, 106 S.Ct. 2009, 2018, 90 L.Ed.2d 445 (1986) (citations omitted). Because we see neither an economic motivation for the OB/GYNs' referral decisions nor any evident economic effect flowing from those decisions, we decline to classify the actions of the OB/GYNs as a group boycott that merits application of the per se rule.
 
 
 71
 Appellant next asserts that the alleged agreement among the OB/GYNs to refer their patients to Dr. Magoon had a "price-fixing" component, and thus constitutes a per se antitrust violation. This contention is easily addressed. As shown by the Supreme Court's ruling in Maricopa County, supra, it is quite true that price restraints warrant application of the per se rule. This conclusion, moreover, is bolstered by Federal Trade Comm'n v. Superior Court Trial Lawyers Assoc., 493 U.S. 411, 110 S.Ct. 768, 107 L.Ed.2d 851 (1990), in which the Court invalidated an agreement among lawyers to stop representing indigent parties until their hourly rates were increased. The Court found that this agreement "was designed to obtain higher prices for [the lawyers'] services," and concluded that the arrangement "was unquestionably a 'naked restraint' on price." 493 U.S. at 423, 110 S.Ct. at 774-75.
 
 
 72
 In the instant matter, however, Appellant has shown neither an intent to restrain prices nor that such a restraint actually resulted from the actions of Appellees. Given the OB/GYNs' indifference to the fees charged by neonatologists, the lack of evidence of any intent on their part to fix prices is not surprising. Moreover, even if we were to accept Appellant's bare assertion, without support in the record, that Dr. Magoon sought dissolution of the cross-coverage agreement in part so that she could raise her fees,[8] we have already noted the dearth of evidence suggesting that Magoon possessed any means of getting the OB/GYNs to accede to this alleged scheme. Finally, Appellant has failed to show that any fee increase followed, let alone resulted from, the OB/GYNs' decisions to refer their patients to Dr. Magoon.
 
 
 73
 In her final attempt to bring her claim within the ambit of per se analysis, Appellant contends that the OB/GYNs' alleged agreement constitutes an unlawful combination among "horizontal" competitors. We have previously found that "horizontal" restraints--that is, agreements among competitors at the same level of the market structure--are particularly suspect because they typically serve no purpose other than to stifle competition. See Bailey's, Inc. v. Windsor America, Inc., 948 F.2d 1018, 1027 (6th Cir.1991). In Bailey's, the plaintiff, a mail-order business selling logging supplies, claimed that it was unable to purchase various chain saw replacement parts because of a conspiracy between the defendant manufacturer of those parts and the distributors of the defendant's products. 948 F.2d at 1019-20. We held that the plaintiff had not established a per se antitrust violation, both because of the absence of concerted action among horizontal competitors and because of the lack of any agreement to control prices. 948 F.2d at 1030-31. At worst, the defendant manufacturer had terminated sales to the plaintiff in order to retain or increase the business it did with its distributors; the court found that this sort of unilateral action was not per se illegal, particularly since the defendant lacked the market power to affect the prices charged by its competitor manufacturers. 948 F.2d at 1030-32.
 
 
 74
 Similarly, the alleged agreement at issue here clearly is not "horizontal" in the sense contemplated in the case law finding that per se analysis applies to horizontal restraints. Although the OB/GYNs certainly are "horizontal competitors" among themselves, they do not compete with Appellant. Thus, the OB/GYNs clearly were not acting to protect themselves from competition. Only a single horizontal competitor of Appellant, Dr. Magoon, was involved in the alleged referral agreement. As noted earlier, no evidence suggests that Magoon instigated that agreement, or that she possessed the influence to secure such an agreement; she was merely the beneficiary of that agreement.
 
 
 75
 Moreover, as Bailey's demonstrates, if Dr. Magoon agreed to accept referrals in contravention of the cross-coverage agreement in order to appease her "suppliers," the OB/GYNs, such unilateral action would not violate antitrust law. A per se violation would exist only if Magoon, through exercise of some unspecified power, secured an exclusive referral arrangement in order to increase her prices and undermine a competitor's practice. Appellant, however, has pointed to no evidence of such a scheme. Finally, we have already observed that the new referral arrangement actually broke up a previous horizontal agreement among the neonatologists.
 
 
 76
 We find, therefore, that Appellant has not demonstrated the sort of inherently anticompetitive combination to which the per se rule applies. It is not enough to assert "simply that [Appellant] has been harmed as an individual competitor;" rather, Appellant must suggest how Appellees' "activities have had [some] adverse impact on price, quality, or output of medical services offered to consumers in the relevant market." Capital Imaging Assocs. v. Mohawk Valley Medical Assocs., 996 F.2d 537, 547 (2d Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 388, 126 L.Ed.2d 337 (1993). Appellant's attempts to label the referral agreement as a "group boycott," a "price-fixing agreement," or a "horizontal restraint" are unavailing in light of the case law demonstrating why true instances of these various business practices violate antitrust law. Quite simply, the instant matter does not present any of the readily apparent anticompetitive dangers, such as price restraints or a dwindling supply of services, that call for application of the per se rule.
 
 
 77
 Finally, Appellant contends that the lower court erred in its reliance on the discredited "learned professions" doctrine as a basis for invoking "rule of reason" analysis. Although Appellant correctly notes that the Supreme Court's decision in Maricopa County, supra, is inconsistent with any blanket "learned professions" exception to the per se rule, the Court nonetheless recognized that the presence of non-economic motivations for a given business practice may be a factor in selecting the rule of reason over per se analysis. In particular, the Court cited its statement in an earlier case that the "public service aspect, and other features of the professions, may require that a particular practice, which could properly be viewed as a violation of the Sherman Act in another context, be treated differently." 457 U.S. at 348-49, 102 S.Ct. at 2475 (quoting Goldfarb v. Virginia State Bar, 421 U.S. 773, 788 n. 17, 95 S.Ct. 2004, 2013 n. 17, 44 L.Ed.2d 572 (1975)). Accordingly, although an entire industry cannot claim a blanket exemption from antitrust law, a court may properly avoid per se invalidation of a particular practice that possesses neither apparent economic justifications nor clear economic implications. The OB/GYNs' justification of their referral decisions as based on matters of professional judgment thus suggests that rule of reason analysis is appropriate.
 
 
 78
 Indeed, courts have generally concluded that the rule of reason applies to practices based on medical considerations.[9] The case most on point is Mosby v. American Medical Int'l, Inc., 656 F.Supp. 601 (S.D.Tex.1987), in which the plaintiff radiologist brought an antitrust claim based on the lost referrals he suffered under a new arrangement between the defendant hospital and the defendant chief radiologist. Under the prior arrangement, the plaintiff was part of an "on-call roster" from which the defendant radiologist chose in order to meet the hospital's evening and weekend radiology needs. 656 F.Supp. at 604. However, the defendant radiologist decided to eliminate the on-call roster and instead hire a full-time assistant; as a result, although the plaintiff continued to practice and receive referrals at the defendant hospital, he was deprived of some referrals. 656 F.Supp. at 604. The plaintiff contended that this new arrangement constituted a conspiracy "to discourage competing radiologists, fix prices of radiological services, and deprive consumers of a choice of radiological services." 656 F.Supp. at 605.
 
 
 79
 The court first found that the plaintiff's price-fixing claim, if true, would be a per se antitrust violation, but that the plaintiff had "failed to set forth specific facts which tend to show price-fixing." 656 F.Supp. at 608. Turning to the plaintiff's claim of lost referrals, the court held that rule of reason analysis was required, and that the plaintiff had failed to show an adverse effect on competition. 656 F.Supp. at 608-09. The court reasoned that the new arrangement appeared to "actually enhance patients' choices," because "[t]he choice of radiologist was no longer limited to the doctor on call." 656 F.Supp. at 609. Just as in the instant case, the court in Mosby found no reason to designate the new arrangement a per se antitrust violation, especially because it replaced a previous arrangement that patently suppressed competition.
 
 
 80
 In summary, we conclude that the court below correctly applied rule of reason analysis to Appellant's antitrust claim, and properly granted summary judgment to Appellees on that claim. While the alleged agreement among the OB/GYNs could conceivably be characterized as a boycott, the anticompetitive concerns and other economic hazards that surround boycotts in more conventional markets simply are not present in this case. Absent a direct analogy to a practice that courts have previously found to be a per se antitrust violation, Appellant must satisfy the rule of reason to establish a violation of antitrust law. Because she has not produced evidence sufficient to withstand such an analysis, her federal antitrust claim fails as a matter of law.[10]
 
 
 81
 C. Appellant Has Failed to Raise an Inference that Appellees' Non-Discriminatory Reasons for Their Promotion and Referral Decisions Were Pretextual
 
 
 82
 In her complaint, Appellant asserted a Title VII claim against Aultman Hospital, and claims under 42 U.S.C. § 1981 against all Defendants-Appellees. Her Title VII claim is based on Aultman's decision to appoint Dr. Magoon rather than Appellant as the hospital's Director of Neonatology. Her § 1981 claims are based on both the selection of Dr. Magoon as the Director of Neonatology and the OB/GYNs' decisions to refer their patients to Dr. Magoon. The district court granted summary judgment to Appellees on all of these claims of discriminatory treatment.
 
 
 83
 In essence, Appellant now argues that the district court failed to consider the totality of the evidence suggesting that Appellees acted with discriminatory motives. Appellant contends that the court below improperly weighed and discredited some of her evidence rather than drawing all possible inferences in her favor, and that the court evaluated each allegedly discriminatory episode in isolation from the others. We disagree, and instead find that the district court properly granted summary judgment to Appellees on the Title VII and § 1981 claims.
 
 
 84
 We first address Appellant's § 1981 claim that the OB/GYNs referred their patients to Dr. Magoon rather than her out of discriminatory motives. This claim, like claims brought under Title VII, is analyzed under the McDonnell Douglas/Burdine evidentiary framework. See Mitchell v. Toledo Hosp., 964 F.2d 577, 582 (6th Cir.1992). Assuming, as did the court below, that Appellant has established a prima facie case under this framework, the OB/GYNs responded with legitimate non-discriminatory reasons for their referral decisions. In particular, as justification for their individual preferences for Dr. Magoon over Appellant, the OB/GYNs cited Dr. Magoon's greater compatibility with their individual philosophies of care, and noted such specific factors as Dr. Magoon's more skillful interactions with both themselves and their patients. Appellant has utterly failed to raise any suspicion that these proffered reasons were pretextual, and has likewise failed to even allege any facts tending to show that the OB/GYNs made their referrals on the improper basis of Appellant's race or color. Consequently, we find that the district court appropriately granted summary judgment on Appellant's § 1981 claim against the OB/GYNs.
 
 
 85
 We next turn to Appellant's claims, under both Title VII and § 1981, that Aultman Hospital's failure to appoint her as its Director of Neonatology was improperly based on considerations of race, color, or national origin.[11] It is first clear, as the district court found, that only two Defendants-Appellees, Aultman Hospital and Dr. Adams, were involved in the selection of Dr. Magoon over Appellant. Dr. Adams, who was a member of the search committee that recommended that Dr. Magoon be appointed Director of Neonatology, has stated that he voted for Dr. Magoon because he believed she was "the best available candidate for the position." (J.A. at 283). Because Appellant offered no evidence suggesting that this legitimate non-discriminatory reason was pretextual, we agree with the district court's determination that Appellant failed to sustain her § 1981 claim against Dr. Adams.
 
 
 86
 Accordingly, we are left only to consider whether Appellant supported her discrimination claims against Aultman Hospital sufficiently to survive summary judgment. Under the McDonnell Douglas/Burdine framework, Appellant established a prima facie case of discrimination by showing that: (1) she was a member of a protected class; (2) she applied for and was qualified for the position of Director of Neonatology; (3) she was considered for and denied the position, and (4) she was rejected in favor of another person with similar qualifications who was not a member of her protected class. See Brown v. Tennessee, 693 F.2d 600, 603 (6th Cir.1982).
 
 
 87
 Aultman Hospital responded with a legitimate non-discriminatory reason for selecting Dr. Magoon over Appellant: namely, its reliance on its search committee's recommendation that the position be offered to Magoon. The search committee reached its decision after hearing presentations from the two in-house candidates, Appellant and Dr. Magoon, and after reviewing a report prepared by an outside consultant. That report in turn recommended that the position be offered to Dr. Magoon, and cited three non-discriminatory reasons for this recommendation: Dr. Magoon's training programs, her leadership in securing referrals from the medical community, and her ability to lead the hospital's NICU to a Level III rating. The search committee adopted two recommendations from the report: that the hospital should enter into immediate negotiations with Dr. Magoon as the in-house candidate of choice, and that the hospital should seriously interview outside candidates in the event that it could not reach an agreement with Dr. Magoon. (J.A. at 368-69).
 
 
 88
 Appellant having established a prima facie case and Aultman having articulated a legitimate non-discriminatory reason for its decision, the ultimate burden then lies with Appellant to show that the hospital's proffered reason is a pretext for discrimination. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-12, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993); Mitchell v. Toledo Hosp., 964 F.2d 577, 584 (6th Cir.1992). The district court concluded that Appellant's showing of pretext was insufficient to survive a motion for summary judgment.
 
 
 89
 Appellant contends that the court below failed to consider whether the totality of the evidence could give rise to an inference of discrimination. To the contrary, we find that the magistrate judge and the district court assessed all of the evidence offered by Appellant, and explained why it did not overcome the hospital's non-discriminatory justification for its decision. Our independent review of this evidence leads us to agree completely with the district court's determination.
 
 
 90
 First, the lower court properly discounted the discriminatory remarks that Appellant alleges were made by non-decisionmakers at Aultman. See Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Educ., 926 F.2d 505, 514 (6th Cir.), cert. denied, 501 U.S. 1261, 111 S.Ct. 2917, 115 L.Ed.2d 1080 (1991). Next, much of Appellant's "evidence" challenging the hospital's proffered reason for its decision consists of her own deposition testimony that other hospital personnel, often unnamed, told her or implied that Aultman acted out of discriminatory motives. Even if we were to overlook the obvious hearsay problems, such statements "are nothing more than rumors, conclusory allegations and subjective beliefs which are wholly insufficient evidence to establish a claim of discrimination as a matter of law." Mitchell, 964 F.2d at 585.
 
 
 91
 In a further attempt to call into question the hospital's stated reason for selecting Dr. Magoon over her, Appellant raises allegations of nepotism. As an initial matter, we note that Appellant has not pointed to any evidence to substantiate these allegations; the mere fact that some hospital decisionmakers were acquainted with Dr. Magoon before she joined the hospital's staff is insufficient to support an inference of nepotism. Moreover, the district court correctly found that charges of nepotism, even if proven, do not constitute evidence of impermissible discrimination under Title VII or § 1981. As stated by the Fourth Circuit:
 
 
 92
 [The plaintiff] maintains that a finding that the [defendant's] promotion decision may have been influenced by nepotism mandates judgment in his favor on his Title VII disparate treatment claim. While we share his distaste for a decision which appears to have been made for reasons other than merit, we do not believe that Title VII authorizes courts to declare unlawful every arbitrary and unfair employment decision. To hold that favoritism toward friends and relatives is per se violative of Title VII would be, in effect, to rewrite federal law. The list of impermissible considerations within the context of employment practice is both limited and specific: "race, color, religion, sex or national origin." We are not free to add our own considerations to the list.
 
 
 93
 Holder v. City of Raleigh, 867 F.2d 823, 825-26 (4th Cir.1989); see also Platner v. Cash & Thomas Contractors, Inc., 908 F.2d 902, 905 (11th Cir.1990).
 
 
 94
 Next, Appellant cites the hospital president's alleged remark that Appellant was "not a selling person" as more direct evidence that the hospital's decisionmakers acted out of impermissible motives. We disagree. First, as the magistrate judge noted, the ambiguity of this remark greatly diminishes its value as evidence of an improper motive. See Phelps v. Yale Sec., Inc., 986 F.2d 1020, 1025-26 (6th Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 175, 126 L.Ed.2d 135 (1993) (finding, in an ADEA case, that a supervisor's remark that the plaintiff's approaching birthday was "a cause for concern" was "too ambiguous to establish the necessary inference of age discrimination"); Kolb v. State of Ohio, Dep't of Mental Retardation and Developmental Disabilities, 721 F.Supp. 885, 900 (N.D.Ohio 1989) ("Ambiguous words, without else, do not demonstrate discriminatory meaning or intent."). The president's alleged statement could just as easily be taken as referring to aspects of Appellant's personality as to such impermissible considerations as her race or physical appearance. More importantly, this remark was allegedly made several years prior to the decision to appoint Dr. Magoon as Director of Neonatology. Thus, even if we were to draw an inference of discriminatory animus from this ambiguous statement, Appellant has not shown that this improper perception played a role in the decisionmaking process she is now challenging. See Phelps, 986 F.2d at 1026 (finding that a supervisor's statements nearly a year before a layoff "were made too long before the layoff to have influenced the termination decision"); cf. Price Waterhouse v. Hopkins, 490 U.S. 228, 277, 109 S.Ct. 1775, 1804-05, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring) (noting that "statements by decisionmakers unrelated to the decisional process itself" do not suffice to shift the burden to the employer in a "mixed motive" case).
 
 
 95
 Appellant invites us to reconsider the significance of this remark in light of the hospital president's awareness, as shown in his deposition testimony, of the hospital's percentage of foreign-trained medical staff. However, upon viewing the president's testimony in its entirety rather than in out-of-context snippets, we decline the invitation to draw an inference of improper motive. The president's belief that approximately thirty percent of the hospital's staff is foreign-trained was derived from studies periodically performed by a hospital employee. Although the president admitted that he referred to those studies to see "how we compare to national norms," he then expressly denied that the hospital made any effort to maintain any specific percentage of foreign-trained doctors. (J.A. at 583-85). We conclude that the various statements made by the hospital president do not indicate an inappropriate awareness of the race or ethnicity of the members of the hospital staff, much less that such improper considerations contributed to the decisionmaking process at issue in this case.
 
 
 96
 Finally, Appellant directs our attention to the statement in the outside consultant's report that one of the external candidates for the position of Director of Neonatology was "American born, American trained." We agree entirely with the magistrate judge's analysis of this statement. No evidence suggests that the statement was adopted or relied upon in any way by hospital decisionmakers; rather, the minutes of the search committee meeting at which the report was discussed show only that the report was passed out and that two of its recommendations, neither of which included the statement in question, were adopted. Moreover, the magistrate judge pointed out the relevance of the external candidate's American versus foreign medical training under Ohio law: under then-existing state law, a foreign-trained candidate for a medical staff position was required to undergo two years of postdoctoral training in order to be eligible for board examinations. Thus, even if it were noticed by hospital decisionmakers, the statement of the outside consultant does not establish discriminatory animus.
 
 
 97
 Appellant makes one final argument in support of her discrimination claims, but this argument misconstrues the Supreme Court's most recent elucidation of the McDonnell Douglas/Burdine framework. Appellant contends that under St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), she can survive summary judgment simply by casting doubt upon Aultman Hospital's proffered reason for its decision. However, Hicks makes clear that a Title VII plaintiff must offer evidence from which it is possible to "infer the ultimate fact of discrimination." 509 U.S. at 511, 113 S.Ct. at 2749. The court below found that the evidence produced by Appellant raises no such inference of discrimination. Our independent review of that evidence reveals that the district court's ruling is fully supported by the record.
 
 
 98
 In sum, we find that Appellant has failed to produce evidence sufficient to support her subjective belief that she was passed up for the position of Director of Neonatology because of her race, color, or national origin. The limited evidence Appellant has offered simply does not establish that the hospital's articulated non-discriminatory basis for its decision was pretextual. Therefore, we affirm the district court's grant of summary judgment to Appellees on all of Appellant's federal discrimination claims.
 
 V. CONCLUSION
 
 99
 For the foregoing reasons, we conclude that the district court correctly applied "rule of reason" analysis to Appellant's federal antitrust claim, and that the district court properly found that Appellant had failed, as a matter of law, to establish her federal discrimination claims. Accordingly, the district court's grant of summary judgment to Appellees on all federal claims is hereby AFFIRMED.
 
 
 
 *
 The Honorable Gerald E. Rosen, United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 The other Plaintiff-Appellant in this action, Canton Neonatology, Inc., is Dr. Betkerur's medical corporation. We refer to both parties jointly as "Appellant" throughout this opinion
 
 
 [2]
 The Defendant-Appellee physicians who allegedly boycotted Appellant include: obstetrician-gynecologists Hoover, Dakoske, Fitz, and Adams, who are associated with the various Defendant-Appellee medical corporations; and perinatologist Holls, who was employed directly by Aultman Hospital. For convenience, we refer to these Defendants-Appellees collectively as the "OB/GYNs."
 
 
 [3]
 Neonatologists are physicians who provide care for high-risk "neonates," or newborn children in their first month of life
 
 
 [4]
 The state classifies hospitals as Level I, II, or III based on their ability to provide maternity and newborn services. Level III hospitals provide the most sophisticated neonatology care, and thus are able to treat more babies on-site rather than transferring them to other, more advanced facilities
 
 
 [5]
 "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials." 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure, § 2727, at 35 (Supp.1994)
 
 
 [6]
 In addition to arguing that "rule of reason" analysis should apply, Appellees deny that the OB/GYNs entered into an "agreement" not to refer patients to Appellant. Rather, they characterize the letter sent by the OB/GYNs to Aultman Hospital on June 18, 1985, as reflecting each OB/GYN's independent and individual decision to refer his patients to Dr. Magoon rather than Appellant. In the absence of an agreement, Appellees conclude that there can be no antitrust violation. See Lie, 964 F.2d at 568 ("To establish an antitrust violation, a plaintiff must show a contract, combination, or conspiracy...."). The OB/GYNs also note that the letter setting forth their alleged agreement lacked any binding effect; the OB/GYNs apparently were free to further modify their individual referral decisions if they so desired. Given our disposition of this case, we need not resolve these issues
 
 
 [7]
 Indeed, Dr. Magoon's June 27, 1984, letter to the hospital indicates that, under the terms of her proposed new contract, she would be financially indifferent to the method by which patients were referred to her. Under that proposed contract, which apparently was not implemented, she would have received a fixed amount of compensation regardless of the number of patients referred to her. In the letter, she discusses the cross-coverage agreement only to highlight the fact that its continuation would necessitate higher fees, with resulting hardship to patients and adverse public relations for the hospital. Thus, the letter suggests that the hospital, but not Dr. Magoon, might have an incentive to seek termination of the cross-coverage agreement
 
 
 [8]
 In fact, as noted earlier, it appears that Dr. Magoon saw dissolution of the cross-coverage agreement as a way of avoiding a fee increase that would otherwise be required in order to satisfy the terms of her proposed new contract
 
 
 [9]
 See, e.g., Lie v. St. Joseph Hosp., 964 F.2d 567, 570 (6th Cir.1992) (applying rule of reason to a claimed agreement to suspend a physician's surgical privileges); BCB Anesthesia Care, Ltd. v. Passavant Memorial Area Hosp. Assoc., 36 F.3d 664, 667-68 (7th Cir.1994) (applying rule of reason to an alleged boycott of a group of certified registered nurse anesthetists, and citing numerous cases holding that a single hospital's staffing decision does not violate the Sherman Act); Capital Imaging Assocs. v. Mohawk Valley Medical Assocs., 996 F.2d 537, 545 (2d Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 388, 126 L.Ed.2d 337 (1993) (applying rule of reason to a radiology group's exclusion from providing services to patients of an HMO); Kiepfer v. Beller, 944 F.2d 1213, 1221 (5th Cir.1991) (applying rule of reason to a physician's claim that he was the target of a campaign by two other physicians to discourage referrals to him)
 
 
 [10]
 Appellees raise two additional arguments in support of summary judgment, neither of which was addressed by the court below. First, Appellees appeal to the "intracorporate conspiracy doctrine," which holds that there can be no conspiracy without the participation of at least two distinct legal entities. In the context of antitrust claims against a hospital and its staff, the Sixth Circuit has invoked this doctrine to find that there can be no antitrust conspiracy "[w]hen the staff as a group makes decisions or recommendations for the hospital in areas that do not affect the market in which they compete as individuals." Nurse Midwifery Assocs. v. Hibbett, 918 F.2d 605, 614 (6th Cir.1990), modified, 927 F.2d 904 (6th Cir.), cert. denied, 502 U.S. 952, 112 S.Ct. 406, 116 L.Ed.2d 355 (1991). Accordingly, because the neonatology referral decisions by the OB/GYNs in this case do not affect the market in which the OB/GYNs compete, Appellees contend that the OB/GYNs were acting as agents of the hospital, and thus were not separate legal entities. Of course, this argument appears inconsistent with Appellees' contention that each OB/GYN made an independent and individual decision to refer patients to Dr. Magoon. In any event, given our disposition of this case, we need not address this issue
 Next, Appellees assert that any anticompetitive effects that may have resulted from the alleged referral agreement cannot possibly have had any more than a de minimis effect on interstate commerce, and they conclude that this agreement lies beyond the scope of the Sherman Act. However, given the Supreme Court's ruling in Summit Health, Ltd. v. Pinhas, 500 U.S. 322, 111 S.Ct. 1842, 114 L.Ed.2d 366 (1991), that the Sherman Act's interstate commerce requirement was satisfied by the allegation that a single physician was excluded from the Los Angeles market for ophthalmological services, it appears that Appellees' argument is without merit.
 
 
 [11]
 We note that Appellant cannot sustain a § 1981 claim based on allegations of discrimination based on her national origin, but that § 1981 protects her from discrimination based on her race, ancestry, or ethnic characteristics. See Saint Francis College v. Al-Khazraji, 481 U.S. 604, 613, 107 S.Ct. 2022, 2028, 95 L.Ed.2d 582 (1987)